Filed 11/16/23  Vaughn v. Jaber-Malek CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ALEXZANDERAH LEE VAUGHN, | H050221 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 22CH010508) |
| v. | |
| JUMANA JABER-MALEK, | |
| Defendant and Appellant. | |

Jumana Jaber-Malek challenges a civil harassment restraining order protecting Alexzanderah Lee Vaughn and entered against Jaber-Malek[1] pursuant to Code of Civil Procedure section 527.6[2] for insufficient evidence.  For the reasons explained below, we reject Jaber-Malek's contentions and affirm the trial court's order.

---

[1] We refer to appellant using the spelling of her last name as it appears in her briefing in this court and in her notice of appeal.  The civil harassment restraining order spells her last name as "Jaber-Malik."  Neither party raises any issue as to this discrepancy.

[2] Unspecified statutory references are to the Code of Civil Procedure.

## I. FACTS AND PROCEDURAL BACKGROUND[3]

Jaber-Malek and Vaughn are related by marriage—Jaber-Malek's uncle married Vaughn's aunt—and are former friends. In addition, Vaughn is friends with Jaber-Malek's ex-husband (M.M.[4]).

In November 2019, Jaber-Malek and M.M. separated. On November 17, 2019, Jaber-Malek initiated a lengthy and heated text exchange with Vaughn in which Jaber-Malek criticized and questioned Vaughn's continued communications with M.M. Jaber-Malek accused Vaughn of having "a big mouth" and going "behind [Jaber-Malek's] back." Jaber-Malek repeatedly demanded Vaughn explain her continued communications with M.M.

For example, Jaber-Malek wrote to Vaughn: "So why the fuck did u call MO,[5] Alex," "Wtf is ur business calling MO," and "Why the fuck did u call him." Vaughn felt harassed by these texts and wanted Jaber-Malek to "leave [her] alone." That same day, Vaughn received a text message from a phone number unknown to Vaughn that also condemned Vaughn's continued communications with M.M. Vaughn believed this message was from Jaber-Malek using "a fake Google number" due to "the content of the messages, the spelling of [Vaughn's] name, [and] the spelling of [M.M.]'s name" as "MO."[6] Vaughn subsequently blocked both Jaber-Malek's phone number and her "jumana_jaber_" Instagram account.

---

[3] "We summarize the facts in the light most favorable to the judgment." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405 (*Brekke*).) We describe conflicting evidence only as relevant to Jaber-Malek's contention of insufficient evidence.

[4] We refer to Jaber-Malek's ex-husband and to the parties' relatives by their initials to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(10).) Unspecified rule references are to the California Rules of Court.

[5] Jaber-Malek refers to M.M. as "MO" or "Mo."

[6] The trial court found sufficient foundational evidence to admit the message but did not make an explicit finding on the record as to whether the message was from Jaber-Malek. Jaber-Malek testified that "multiple people were privy to [the text] conversation"

On November 17, 2019, Vaughn also received, but did not respond to, text messages and phone calls from Jaber-Malek's father (F.J.).[7] Vaughn believed Jaber-Malek's father was trying to contact Vaughn on Jaber-Malek's behalf "[b]ecause [Jaber-Malek] couldn't get a hold of [Vaughn]" and because Vaughn and F.J. "don't speak otherwise."

Vaughn received a series of 21 missed calls from an unidentified number in December 2019 or December 2020.[8] Vaughn believed Jaber-Malek was the source of these missed calls because of the messages Vaughn "had received via social media, the fact that [Vaughn] had [Jaber-Malek] blocked, and the fact that then [Jaber-Malek] tried to contact [Vaughn] through an app."

Vaughn testified that, sometime after she blocked Jaber-Malek's phone number and jumana_jaber_ Instagram account, Vaughn received messages from "fake profiles" that she believed belonged to Jaber-Malek.[9] She based her belief on her "knowledge of [Jaber-Malek] as a person," stating "I know what she does when she's doing what she does, and I've never received this kind of influx of fake messages, fake profiles." After Vaughn responded to these friend requests by addressing the requestor as " 'Jumana' "

she was having with Vaughn on November 17, 2019, and that everyone in her family refers to M.M. in text as "MO."

[7] While the trial court did not admit F.J.'s text messages into evidence and did not permit Vaughn to read them or any other unadmitted evidence into the record, Vaughn testified (without objection from Jaber-Malek) about the content of the text messages from F.J. and from A.J., the telephone log, and police reports (discussed further below).

[8] Vaughn testified the calls came in December but did not know and could not tell from the telephone logs whether they came in December 2019 or in December 2020. Jaber-Malek objected to admission of the telephone logs, and the trial court sustained the objection.

[9] Vaughn attached these friend requests to her application for a temporary restraining order (TRO application), which appears in the record on appeal following Jaber-Malek's motion to augment. The trial court did not admit the friend requests into evidence, and we will not consider their content in assessing whether the order is supported by sufficient evidence. However, Vaughn testified without objection to her beliefs about the origin of these friend requests.

and telling her to " 'stop or I will file a restraining order,' " "they immediately deleted themselves completely. The profiles disappeared. If it wasn't her, why not respond and say, hey, it wasn't so and so."

On May 22, 2020, despite being blocked, Jaber-Malek sent four direct messages from her jumana_jaber_ Instagram account to Vaughn. Jaber-Malek accused Vaughn of "stalking" her, being "unstable," "talk[ing] badly about" her to M.M., and of making "false accusations" about Jaber-Malek "hack[ing]" into M.M.'s e-mail and about M.M. serving Jaber-Malek with a restraining order. Vaughn responded "Don't write me!!!"

On June 26, 2020, Vaughn received text messages from Jaber-Malek's uncle (A.J.) asking to talk.[10] Vaughn believed he was contacting her on behalf of Jaber-Malek because Vaughn and A.J. "don't talk otherwise," and she "hadn't heard from him in ten years." Vaughn testified she responded to A.J. by saying: " 'If it's about [Jaber-Malek], I have nothing to say. I want nothing to do with that girl.' " When Vaughn and A.J. "did finally speak on the phone because he was so incessant, he would not stop calling, it was about" Jaber-Malek. A.J.'s "persistent conduct" "stressed [Vaughn] out" and "made [her] feel harassed."

On October 29, 2020, Jaber-Malek attempted to call Vaughn using Facebook Messenger. The parties did not speak. Vaughn believed Jaber-Malek tried to call Vaughn using Facebook Messenger because Vaughn had blocked Jaber-Malek's number on her cell phone.

Jaber-Malek's attorney sent Vaughn a letter dated December 18, 2020, demanding Vaughn "immediately cease and desist from any and all harassment, libel and slander,

---

[10] The actual text messages from A.J. were not admitted into evidence.

and defamatory statements made to and/or in reference to" Jaber-Malek, M.M., and others.[11]

In December 2020, Jaber-Malek attended Vaughn's grandmother's funeral. Vaughn testified she left her grandmother's funeral "for two hours" after Jaber-Malek arrived. She believed Jaber-Malek showed up at the funeral "[t]o harass" and "[t]o intimidate" Vaughn. Jaber-Malek testified she attended Vaughn's grandmother's funeral at the invitation of Vaughn's grandfather, but did not have "any communications or discussions with [] Vaughn directly."

On January 6, 2022, Jaber-Malek attempted to call Vaughn using Jaber-Malek's jlux.design Instagram account.[12] Jaber-Malek followed up on that call by sending two direct messages from that Instagram account to Vaughn. In these messages, Jaber-Malek accused Vaughn of "bashing" and "slandering" her and others, "constantly talking badly about" her to M.M., and having "internal daddy issues." In addition, she asserted that she "tried to call [Vaughn] to confirm validation [*sic*] and 'hear' [Vaughn] out if there was anything here being misconstrued," and concluded with: "[A]s I was unsuccessful [] you leave me no choice but to proceed on my end."

On January 10, 2022, Vaughn applied for a temporary restraining order, alleging harassment by Jaber-Malek, and attached documents in support of her request. On January 12, 2022, the trial court issued a temporary restraining order, which was served on January 14, 2022. Jaber-Malek filed a response to the TRO application together with supporting documents.

---

[11] While this letter is part of the record on appeal, it may not, as a matter of law, constitute part of the course of conduct of harassment. Litigation and prelitigation activities such as Jaber-Malek's cease-and-desist letter are constitutionally protected activities that are not included within the meaning of "course of conduct" under section 527.6. (See, e.g., *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 502, fn. 5 (*Harris*).)

[12] It appears from the content of the messages that this call occurred in 2022. The trial court did not make any explicit findings as to the dates of the call and messages through Jaber-Malek's jlux.design Instagram account.

During the subsequent hearing, Vaughn testified A.J. and Jaber-Malek's cousin (M.J.) sent Vaughn messages on Facebook on January 14, 2022, criticizing Vaughn for including text messages in the TRO application that "were from [M.J.] admitting to the molestation." Vaughn believed those messages indicated that A.J. and M.J. knew which exhibits were included in the TRO application.[13] Vaughn further testified that, on January 15, 2022, A.J. again sent Vaughn a message on Facebook Messenger, this time criticizing Vaughn for mentioning Vaughn's grandmother's funeral in the TRO application.

When Vaughn told A.J. "he had absolutely no right to write [Vaughn], and it was a violation of the TRO and he needed to immediately stop," A.J. responded " 'You don't have a restraining order against me.' " Vaughn also testified M.J. "reach[ed] out to" Vaughn "regarding [Vaughn's] plan to seek a restraining order." Vaughn believed Jaber-Malek was using Jaber-Malek's family to contact Vaughn "because [Jaber-Malek] can't directly herself anymore because of the TRO."[14] As a result, Vaughn believed "it was necessary to have these incidents reported to the police" because Jaber-Malek "wasn't respecting the TRO." "The whole reason [Vaughn] came [to the court] was to be left alone and to have something in writing so [Jaber-Malek] wouldn't come after [her] and [Jaber-Malek] was still not respecting it; so [Vaughn] knew it needed to be documented."

Without citing any specific dates or means of communication, Vaughn testified: (1) Jaber-Malek reached out both to Vaughn's aunt "on three different occasions asking to go to lunch and to talk on the phone," and to Vaughn's uncle; (2) A.J. reached out to Vaughn's uncle "asking him to influence [Vaughn] to drop the restraining order"; and

---

[13] Vaughn testified to these communications from Jaber-Malek's family during the hearing, but the trial court did not admit into evidence the "incident reports and police reports" Vaughn filed regarding the communications.

[14] Jaber-Malek acknowledged that she "shared with [her] family what had happened" when she was arguing with Vaughn via text messages on November 17, 2019, and when she was served with the temporary restraining order. However, Jaber-Malek denied that she directed A.J. or M.J. to reach out to Vaughn.

(3) Jaber-Malek sent their mutual childhood friend—Vaughn's "best friend"—a "scathing text message."[15] These incidents led Vaughn to believe Jaber-Malek's conduct and that of her family would continue because the "TRO didn't stop them. It hasn't stopped them."

When asked at the hearing about the emotional impact the communications from Jaber-Malek and Jaber-Malek's family have had on her, Vaughn responded: "Stress, anxiety. It's annoying. I feel threatened. I literally thought that there was a PI in front of my house because I live in a court. She's contacted an ex-girlfriend of mine. It just seems to not stop. She's relentless. And at the end of the day, I do know this girl, and I do know what[] she's capable of. And she's mentioned to many people that she would stop at nothing to destroy me. Those were her words."

On June 6, 2022, the trial court granted Vaughn pursuant to section 527.6 a two-year civil harassment restraining order against Jaber-Malek.

## II. DISCUSSION

Jaber-Malek contends that Vaughn's "evidence did not support the [restraining] order," and asks this court to vacate it. Jaber-Malek argues that there is "no clear and convincing evidence of harassment" and section 527.6 is not meant to address "bad feelings over the end of a friendship." Vaughn counters that substantial evidence supports the trial court's order.

A. *Section 527.6*

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.] It does so by providing expedited injunctive relief to victims of harassment." (*Brekke*, *supra*, 125 Cal.App.4th at p. 1412.)

---

[15] The parties did not testify about the content of this text message, and it was not admitted into evidence.

7

Under section 527.6, subdivision (a)(1), "[a] person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in" section 527.6. Section 527.6, subdivision (b)(3) defines " '[h]arassment' " as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."[16]

Section 527.6, subdivision (b)(1) defines " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "[17]

"If the [trial court] finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (§ 527.6, subd. (i).)

B. *Analysis*

We review the trial court's decision to grant the restraining order for " 'whether the findings (express and implied) that support the trial court's entry of the restraining

---

[16] Although the trial court did not identify in the restraining order the type of harassment it found Jaber-Malek committed, Jaber-Malek asserts—and Vaughn does not dispute—that there was no evidence of unlawful violence or threat of violence in this case. We agree and focus our analysis on course of conduct harassment.

[17] Jaber-Malek does not contend that her messages and phone calls to Vaughn constituted constitutionally protected activity. Moreover, speech "between purely private parties, about purely private parties, and on matters of purely private interest," is not entitled to constitutional protection. (*Brekke*, *supra*, 125 Cal.App.4th at pp. 1404, 1409.)

order are justified by substantial evidence in the record.' " (*Harris*, *supra*, 248 Cal.App.4th at p. 497.) When conducting our review, we must "not reweigh the evidence itself" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008 (*O.B.*)), but must instead "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.) " 'But whether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6 . . . [is a] question[] of law subject to de novo review.' " (*Harris*, at p. 497.)

### 1. Course of Conduct Directed at a Specific Person

Jaber-Malek asserts that "[t]he evidence of contact . . . was two social media messages [Vaughn] elected to unblock and read," which "cannot establish either harassment or a course of conduct justifying a restraining order." We disagree.

Jaber-Malek repeatedly maintains that the fact that Vaughn accepted and read the Instagram direct messages from Jaber-Malek rendered the messages nonharassing. However, she does not cite to any authority or develop any legal argument to support this claim. Jaber-Malek has thus forfeited this claim on appeal by failing to cite any legal authority in support. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 282.) Further, the authority we have located undermines Jaber-Malek's contention. (See *Brekke*, *supra*, 125 Cal.App.4th at pp. 1405–1407, 1413–1415 [the fact that respondent read appellant's profanity-laced letters did not render those letters nonharassing in nature].)

The statute defines " '[c]ourse of conduct' " as "a series of acts over a period of time, however short, evidencing a continuity of purpose." (§ 527.6, subd. (b)(1).) Webster defines "series" as "a *number* of things or events of the same class coming one

9

after another in spatial or temporal succession." (Webster's 10th New Collegiate Dict. (1999) p. 1069, italics added.)

Beyond the requirement that there be more than one act to qualify as a " '[c]ourse of conduct' " (§ 527.6, subd. (b)(1)), the statute does not prescribe the necessary number or frequency of the acts required for a finding of course of conduct harassment. Moreover, in deciding whether to issue the order, the trial court views the evidence as a whole, including incidents that, if viewed in isolation, might seem trivial, but cumulatively could constitute a harassing course of conduct. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 190 (*R.D.*).)

The record contains substantial evidence from which the trial court could conclude that Jaber-Malek directed a series of messages and phone calls to Vaughn rebuking Vaughn for her continued communications with M.M. and berating her for allegedly "talk[ing] badly" about and "bashing" Jaber-Malek. These communications include text and social media messages on November 17, 2019, May 22, 2020, and in January 2022, as well as a call through Instagram on January 6, 2022, which precipitated the January 2022 direct messages on Instagram. That Jaber-Malek's communications all focus on two things—Vaughn's communications with M.M. and Vaughn "talk[ing] badly" about Jaber-Malek to others—shows a continuity of purpose.

In addition to written evidence, "[c]ircumstantial evidence can be substantial evidence for an inference based on it." (*Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1110 (*Ensworth*), disapproved in part on another ground in *O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) The circumstantial evidence also supports Vaughn's contention that the harassing course of conduct was not limited to the direct communications from Jaber-Malek.

The text message from the unknown number and the texts from F.J. were sent the same day as Jaber-Malek's and Vaughn's argument over text, on November 17, 2019, when Jaber-Malek "was sitting with multiple family members." Moreover, the text from

10

the unknown number contained content similar to that of the November 17, 2019 text messages between Vaughn and Jaber-Malek. The June 26, 2020 texts from A.J. followed Vaughn's "Don't write me!!!" response to Jaber-Malek's May 22, 2020 messages.

When Vaughn and A.J. finally did speak as a result of those "incessant" texts, A.J. wanted to talk to Vaughn about Jaber-Malek. A.J. and M.J. sent Vaughn multiple messages after the trial court issued the temporary restraining order, each criticizing Vaughn for the contents of the TRO application. Although Jaber-Malek denied sending or directing others to send the messages, the trial court was entitled to credit Vaughn's conflicting testimony that Jaber-Malek "triangulates with" her family to contact Vaughn. The trial court also could reasonably surmise from the timing and/or content of the communications to Vaughn from Jaber-Malek's family that Jaber-Malek had discussed the matters with her family members and either influenced or directed their communications to Vaughn and the contents of such communications.

The trial court explicitly found that Jaber-Malek's "denials of the alleged conduct" were not "credible or persuasive under the circumstances presented." Conversely, the trial court found Vaughn's testimony "credible" and "supported." "[W]e must defer to the trial court's determinations of credibility." (*Harris*, *supra*, 248 Cal.App.4th at p. 498.) Given the trial court's express credibility findings and directive prohibiting Jaber-Malek from contacting Vaughn "through family members, or through mutual friends or acquaint[a]nces," we must infer the trial court resolved the conflicting evidence in Vaughn's favor. "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630), and we "accept the fact finder's resolution of conflicting evidence." (*O.B.*, *supra*, 9 Cal.5th at p. 1008.)

2. <u>Seriously Alarm, Annoy, or Harass, with No Legitimate Purpose</u>

Although Vaughn blocked Jaber-Malek's phone number and social media accounts, repeatedly told Jaber-Malek to stop contacting her, and told Jaber-Malek's

11

family that she does not want to talk about Jaber-Malek, Jaber-Malek continued to attempt to compel contact with Vaughn. That Jaber-Malek has an explanation for her behavior—expressing her "feelings of hurt and betrayal"—does not legitimize her conduct or keep her messages from being seriously alarming, annoying, or harassing. The trial court, as the trier of fact, was not required to accept Jaber-Malek's explanations or suggestions of a legitimate purpose other than harassment.

We "must indulge reasonable inferences that the trier of fact might have drawn from the evidence." (*O.B.*, *supra*, 9 Cal.5th at p. 1008.) In her messages to Vaughn, Jaber-Malek, among other things, accuses Vaughn of "stalking" Jaber-Malek, calls Vaughn "unstable," and says Vaughn has "internal daddy issues or whatever problems you have." Jaber-Malek's family members added to the unwelcome communications aimed at Vaughn, repeatedly calling and texting her whenever Vaughn rebuffed Jaber-Malek's attempts with silence, express refusals to engage, and, ultimately, the temporary restraining order.

The record contains substantial evidence (including Vaughn's own testimony) from which the trial court could conclude that Jaber-Malek's and her family's repeated, unwelcome, disparaging messages in the face of Vaughn's refusal to engage, alarmed, annoyed, and/or harassed Vaughn. Furthermore, the record contains no suggestion that this conduct served a legitimate purpose.

### 3. Substantial Emotional Distress

There is likewise substantial evidence to support the trial court's conclusion that Jaber-Malek's course of conduct "would cause a reasonable person to suffer substantial emotional distress" and did "actually cause [Vaughn] substantial emotional distress." (§ 527.6, subd. (b)(3).)

A trial court may infer substantial emotional distress from the nature of the harassing conduct. (*Ensworth*, *supra*, 224 Cal.App.3d at pp. 1110–1111.) We see no basis to disturb the trial court's implicit conclusion that a reasonable person receiving

12

repeated communications of the type sent by Jaber-Malek and her family, after clearly conveying (both by nonresponsiveness and explicit messages) that she had no desire for further contact, would be upset and worried that she had become the subject of unwelcome and persistent attention, and would not be left alone without the issuance of a restraining order.

Moreover, "[i]nferences may be drawn not only from the evidence but from the demeanor of witnesses and their manner of testifying." (*Ensworth*, *supra*, 224 Cal.App.3d at p. 1110.) When assessing witness testimony, " ' "it is the exclusive province of" ' " the trial court " ' "to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) We "may not insert [our] own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment." (*O.B.*, *supra*, 9 Cal.5th at p. 1008.)

Although Jaber-Malek couches the dispute between her and Vaughn as nothing more than "bad feelings over the end of a friendship," hers is but one interpretation of the evidence. The trial court observed the parties testify and was in a better position to assess their demeanor and credibility, as well as the effect of Jaber-Malek's behavior on Vaughn. Vaughn testified that she experienced "[s]tress" and "anxiety" as a result of Jaber-Malek's conduct, and that she felt annoyed, harassed, and threatened by Jaber-Malek's "relentless" actions. The trial court expressly found Vaughn's testimony "to be credible" and "supported by circumstantial evidence, and as to some allegations, by documentary evidence." We therefore ascertain from the restraining order that the trial court found credible Vaughn's testimony that she suffered substantial emotional distress as a result of Jaber-Malek's harassment.

We conclude that there was substantial evidence to support the trial court's implicit finding that Vaughn suffered substantial emotional distress.

### 4. Likelihood of Harassment Recurring

"An injunction is authorized only when it appears that wrongful acts are likely to recur." (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402.) When ascertaining the reasonable probability that harassment " 'will be repeated in the future,' " (*Harris*, *supra*, 248 Cal.App.4th at p. 499) we review the harassing conduct " 'in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.' " (*Id*. at pp. 499–500; see also *R.D.*, *supra*, 202 Cal.App.4th at pp. 189–190.)

The trial court did not expressly find that it was "reasonably probable" that the harassing conduct would continue without a restraining order. (*Harris*, *supra*, 248 Cal.App.4th at p. 500.) However, "[g]iven that it issued an injunction, we may infer that the trial court impliedly found that it was reasonably probable that future harassment would occur." (*Id*. at p. 501.) The evidence supports this conclusion.

The messages from Jaber-Malek to Vaughn show Jaber-Malek refused to accept Vaughn did not want to communicate with her, and instead engaged in a course of conduct to try to force contact with Vaughn. As Jaber-Malek herself notes in her January 2022 Instagram direct messages to Vaughn, it had been approximately two and one-half years since the November 17, 2019 dispute that triggered the end of Jaber-Malek and Vaughn's friendship. Yet Jaber-Malek continued to seek out and pursue contact with Vaughn regarding Vaughn's communications with M.M. and comments regarding Jaber-Malek.

In addition, Jaber-Malek and Vaughn are distantly related and have mutual friends and acquaintances. Jaber-Malek attended Vaughn's grandmother's funeral, purportedly at the invitation of Vaughn's grandfather, and both parties have noted their close connections through family and friends. Based on the content of Jaber-Malek's messages, conversations with such shared contacts triggered at least her May 2020 and January 2022 messages to Vaughn. In addition, as discussed *ante* (pt. II.B.1.), we may

14

infer from the express prohibitions in the restraining order that the trial court concluded Jaber-Malek used her family members as her proxies in the harassment of Vaughn, both before and after the issuance of the temporary restraining order.

Given the ongoing animosity between the parties, the circumstances triggering Jaber-Malek's diatribes to Vaughn, and the certainty that Jaber-Malek and Vaughn would continue to cross paths due to their "many shared interpersonal relationships," substantial evidence supports the trial court's implicit finding that it was likely that Jaber-Malek's harassment of Vaughn would continue in the absence of court intervention. The precipitating circumstances continue to exist, and, thus, establish a likelihood of future harm absent a restraining order.

Viewing the evidence in the light most favorable to Vaughn, considering the trial court's negative credibility assessment of Jaber-Malek and positive credibility assessment of Vaughn, and resolving all conflicts in Vaughn's favor, we determine there is substantial evidence supporting the trial court's finding by clear and convincing evidence that Jaber-Malek engaged in unlawful harassment of Vaughn under section 527.6.

## III. DISPOSITION

The civil harassment restraining order is affirmed. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____
                   Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Bromberg, J.

**H050221**
*Vaughn v. Jaber-Malek*