[No. C044810. Third Dist. Jan. 25, 2005.]

BEVERLY L. BREKKE, Plaintiff and Respondent, v.
DEAN WILLS, Defendant and Appellant.

COUNSEL

Freda D. Pechner for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

OPINION

**SCOTLAND, P. J.**—This case is a parent's nightmare come true. Plaintiff's 16-year-old daughter, Danielle, started acting out after she became the girlfriend of a 15-year-old boy, defendant, whom she met at school. In addition to her behavioral problems at home, Danielle began skipping school, her grades declined, and she failed three classes. Fearing that her daughter might be using drugs, plaintiff openly searched Danielle's room and found some disturbing letters written by defendant, instructing Danielle how to retaliate against plaintiff for the restrictions that she had imposed on Danielle. Believing that defendant was a cause of Danielle's behavior problems, plaintiff told them they could no longer see each other.

Defendant became angry and wrote three vile and vitriolic letters to Danielle, anticipating that plaintiff would discover and read them. One letter—repeatedly demonstrating that defendant's favorite word is "fuck"— relates his plan to deliberately provoke plaintiff or Danielle's father into physically attacking defendant, whereupon he would sue them and, "[w]hen we're eighteen then we can use the money to be together." Another letter, with the salutation, "Dear Bev [plaintiff]," warns that her efforts to stop Danielle from seeing defendant are for naught, "Fuck you in the ass. You won't win," and states "just fucking give up and let us live our own damn lives." Saying he " 'oughta' " date " 'your daughter,' " because " 'I like the way she tastes,' " defendant tells plaintiff to "[j]ust get away from my ass and rape yourself you psychotic fucking whore." Yet another letter contemplates defendant and Danielle killing plaintiff and her husband, after which "there will be no trace of your parents. Then we'll go hang out."

Alarmed that defendant became angry when plaintiff told Danielle she could no longer see him, that he wrote letters "instructing/coaching my daughter to create disharmony in my home," and that he even contemplated killing plaintiff and her husband, plaintiff sought "a temporary restraining order and an injunction prohibiting harassment" by defendant. (Code Civ. Proc., § 527.6.)

Apparently coddled rather than castigated by his parents, the 15-year-old defendant showed up in court with an attorney to defend what appears to be

indefensible. Wrapping himself with the "[f]reedom of speech, freedom of association, [and] right of privacy," defendant declared he did "nothing to Plaintiff or any member of her family that would merit an injunction." According to defendant, his letters were "not a threat to anyone," but were "a joke" designed to prove that plaintiff was searching Danielle's room since "we knew she would say something if she found it." In defendant's view, the letters would not have caused a reasonable person in plaintiff's position to suffer substantial emotional harm because "any parent should expect some emotional distress when they do not like their children's choice of friends." Defendant denied that he had ever manipulated Danielle or coached her to create disharmony in plaintiff's home, and he blamed plaintiff for Danielle's problems in school.

Unmoved by defendant's pronouncement that he and Danielle "would like our parents to accept the fact that we love each other, and that we would never hurt each other or each other's families, either," the trial court enjoined defendant from contacting Danielle and members of her family, and ordered him to stay at least 100 yards away from them, except at school where he must stay at least 20 feet away.

On appeal, defendant contends the order must be reversed because (1) there was no evidence of a credible threat of violence or a knowing and willful course of conduct by defendant that would seriously alarm, annoy, or harass a person, (2) the injunction violates his rights of freedom of expression and association, and his right to privacy, and (3) the order is void because it contains no expiration date.

We shall affirm the injunction as modified to expire when Danielle becomes an adult on her 18th birthday. As we will explain, defendant engaged in a course of conduct directed at plaintiff that seriously alarmed, annoyed, and harassed her; that would cause a reasonable person to suffer substantial emotional distress; and that actually caused plaintiff to suffer substantial emotional distress. (Code Civ. Proc., § 527.6, subd. (b).) Utterly without merit are defendant's claims that the injunction violates his constitutional rights. His speech—which was used to annoy, ridicule, and threaten plaintiff—was entitled to no protection because it was between purely private parties, about purely private parties, and on matters of purely private interest. Defendant has no right to associate with Danielle, who is a minor child. And the right of privacy does not entitle him to interfere with plaintiff's exercise of her fundamental right as a parent to direct and control her daughter's activities. Finally, contrary to defendant's claim, the injunction has an expiration date and is not void. However, it must end when Danielle becomes an adult and has the right and responsibility to make her own decisions about those with whom she will associate.

## FACTS

We summarize the facts in the light most favorable to the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 [94 P.3d 513].)

While attending the same school, plaintiff's 16-year-old daughter, Danielle, and the 15-year-old defendant, Dean Wills, became girlfriend and boyfriend. Thereafter, Danielle's relationship with her parents deteriorated, and she began to display negative behavior at home. She also started skipping classes at school and failed three courses.

Danielle's parents attempted to correct the situation by having Danielle see a counselor, getting counseling themselves, and attending parenting classes. Concluding that Danielle's relationship with defendant was not a "healthy one" and that he was undermining the family's efforts to deal with Danielle's problems, plaintiff told her daughter that the relationship with defendant must end.

Defendant then telephoned plaintiff because he did not understand why he could not see Danielle. According to plaintiff, she tried to explain why she was concerned about his relationship with Danielle, but defendant "argued every point" and would not listen to what she had to say. Plaintiff finally became frustrated and "just basically said we're done with this conversation," told him, "You need to stay away from my daughter," and "hung up the phone at that point." In a letter he wrote to Danielle, defendant admitted laughing at plaintiff when she said that she was trying to do what was best for Danielle, and he acknowledged "cuss[ing]" at plaintiff, saying Danielle was "fucking scared" of her.

When plaintiff began to fear that Danielle might be using drugs, she searched Danielle's room and found letters that her daughter had received from defendant. According to plaintiff, "many of them were disturbing but not threatening. Some of them were instructions on how to retaliate against me for the consequences [Danielle] was getting. Those were—I think those ones were kind of manipulative but not serious threats."

Plaintiff did not make a secret of the fact that she was searching Danielle's things; and based on substantial evidence, the trial court found that defendant knew plaintiff would search for additional letters. So he gave Danielle three more letters with the expectation that plaintiff would read them. Two of the letters are signed "Bill Aaron." The third, addressed to plaintiff, is unsigned. For "[n]o particular reason," defendant prefers to be known as Bill and uses his middle name of Aaron as a last name. He concedes that he wrote the letters.

In one letter defendant states, "Your mom is crazy," repeats that assertion several times, and relates a plan to deliberately provoke plaintiff or Danielle's father into physically attacking defendant. He says he will do nothing to respond, but will then call his lawyer. Danielle's parents will be forced to pay his bills for the rest of his life and, when defendant and Danielle are 18 years old, they can "use the money to be together. Buy a big house, pay for a huge wedding, a long honeymoon. We'll make sure to let your parents know that they're paying for it. They on the other hand, will be living in the caddy all broken down and shit. It'll work out fine."

Defendant goes on to say: "Your mom's a stupid whore. . . . She fuckin' lied straight up to you though. . . . There is no way she could get a restraining order. The judge will laugh at her. Also, I have a good lawyer already and she doesn't. . . . So I'm going to ruin the things between you two huh? What is there to ruin, a door? He. He. He. . . . Your mom said that now that you can't see me that you've been more cooperative with her and your [sic] not being as disobedient. I told her that was because you were scared of her and she said, no, I really think she's trying to be a better person and earn our trust back. 'She's fucking scared of you!' That was the only time I cussed at her. Yeah, we argued that one for a while. Apparently you had her going. She really thought what she was doing was working. She's a pretty smart person ☺. He. He. Very intelligent. lol." Defendant acknowledges he laughed at plaintiff when she said that she was doing what was best for her daughter.

After relating how plaintiff ended her telephone conversation with him, defendant says: "Fuck her. Stupid bitch. I hope she reads this too. Just in case she read [sic] this, this is to her." He then instructs plaintiff to turn to page eight, which is a separate letter that we quote in full below, including defendant's sometimes extraneous use of quotation marks.

"Dear Bev [¶] 'Why don't you fucking pull your head out of your ass and stop lying to everyone then accusing everyone else of lying just so you don't get caught in your own damn lie. Fuck you in the ass. You wont [sic] win. No matter what you do or say I will always be there for your daughter. The more you hurt her the more I have to be there for her. The more time you take away from us, the more we have to find, the more class we have to skip. Just keep fucking yourself in the ass because everything you say is contradictory bull-shit. Your [sic] just jealous 'cause we're young and in love. Is there a problem with being in love with someone, just because you lost yours doesn't mean you have to take ours. The problem is that you can't take it so just fucking give up and let us live our own damn lives. When we get married, do you want to be accepted by your son in law or hated by him. Hated by me. When she's an adult, do you ever want to talk to her again. Just get away from my ass and rape yourself you psychotic fucking whore.' "

Defendant added two postscripts to the "Dear Bev" letter, which purportedly are song lyrics: "ILP—'Can I date your daughter, I mean I think I oughta, I like the way she tastes.' ☺ [¶] This one's for you too. [¶] Goldfinger—'She's a bitch, fuck her, asshole, fuck her' X2."

The most notable aspect of the third letter is the fantastical scheme of torture-murder set forth by defendant. He tells Danielle, "Contemplating is the enjoyment of everything," and advises her to start by contemplating killing her parents. He then relates a scenario where Danielle's parents would be tied to a tree surrounded by starving, rabid dogs. Defendant and Danielle would fly over in a plane and drop bloody meat on them. Then the dogs would be released one by one. When the dogs finish attacking, there will be no trace of Danielle's parents and "[t]hen we'll go hang out."

After plaintiff read these letters, she sought a temporary restraining order and injunction against defendant. (Code Civ. Proc., § 527.6.)

At the hearing, plaintiff testified that defendant's actions toward plaintiff and her family were "disturbing." After testifying that the threat to kill "kind of came off like a joke," plaintiff nonetheless stated she took it "very seriously." In her words, "I have to say that when you deal with an imbalanced [*sic*] person or seemingly imbalanced [*sic*] person, irrational person, there is no way of telling what that person is capable of doing." Plaintiff also testified that she felt harassed and annoyed by defendant's conduct. As for Danielle, plaintiff testified that her daughter was "doing much better" in terms of school and behavior at home "since there has been the no contact."

Defendant's mother, Donna Wills, testified that during their conversations, plaintiff never expressed any fear of defendant. Mrs. Wills asked plaintiff to drop the case against defendant "[b]ecause in your bringing this to the court, that put him in a precarious situation that I was not willing to just leave him dangling." Instead, Mrs. Wills wanted plaintiff to "work together with me and my husband to work with our children."

Defendant's father, Daniel Wills, testified that his son's letters were "not ones that made me very happy," but that plaintiff expressed no fear because, in Mr. Wills's words, the letters "were not believable." Rather than a no-contact order, he wanted to "minimize the contact between the two but don't force them apart otherwise it would end up like a Romeo and Juliet situation." Mr. Wills acknowledged seeing defendant "so upset that it was very hard for him to control himself." However, he opined that defendant was not a threat—"He may punch a wall but no he walks away. He will not hurt somebody." Mr. Wills opposed an injunction because, in his words, "I think it

would actually antagonize things and make things worse. And put [defendant] closer to an edge we don't want him [to be] near. That at any given time somebody might do something that could push him over the edge of the restraining order and cause him further legal problems."

During his testimony, defendant denied threatening plaintiff or trying to manipulate Danielle. His letters were simply a "joke," a "test" to find out whether plaintiff was searching Danielle's room. According to defendant, contemplating killing Danielle's parents was just "to release stress for her and get[] her to start thinking just of other options rather than being close minded about everything"; the "only way that I thought I can get her to start listening to everyone and stop being depressed was to go to the extreme." As to his telephone conversation with plaintiff, defendant characterized her comments as "blah, blah, blah."

The trial court issued the injunction, explaining: "We have a disrespectful defendant before the Court. Disrespect is not the basis for the issuance of a restraining order. What I find of major significance in this case is that the defendant's father Dan basically states that he was wondering whether or not the issue of a restraining order would antagonize the defendant. That's the word he used. If the Court issues the restraining order, he does not know how his own son will react. He is concerned about the defendant son. The plaintiff in this case equally shares that fear. [¶] I think that the danger [plaintiff] feels is real. And in light of the evidence in this case . . . I think the action, that is, the letters, would alarm a reasonable person [and] alarmed [plaintiff]. It is harassment. There's discussion about killing a parent, ways to do so. There's discussions about [how] he's going to provoke an attack by [plaintiff] . . . I think that's disturbing and quite rightfully so. [¶] . . . [¶] I assume that some people are aware of the Columbine High School students['] little discussions that somebody thought to be quite funny at some period of time, didn't take it serious[ly]. These are not just high school kids these days. This is just not a 15-year old. [¶] . . . [Defendant is] very mature for his age and should take responsibility, [but he] has not chosen to do so. And I don't care if he is antagonized by the Court issuing orders. It is an appropriate case to issue the restraining order."

Again referring to the testimony of defendant's father, the trial court stated in closing: "This is not a typical Romeo and Juliet case because at least Romeo was respectful to Mrs. Capulet[.] And the defendant is not in this case. And I'm shocked."

## DISCUSSION

### I

We begin our analysis by rejecting defendant's claim that the injunction violates his First Amendment rights of freedom of speech and freedom of association, as well as his right to privacy.

### A

■ The United States Supreme Court has "long recognized that not all speech is of equal First Amendment importance. It is speech on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection.' [Citations.]" (*Dun & Bradstreet v. Greenmoss Builders* (1985) 472 U.S. 749, 758–759 [86 L.Ed.2d 593, 602, 105 S.Ct. 2939], fn. omitted.) The " 'special concern [for speech on public issues] is no mystery': [¶] 'The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." [Citations.] "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." [Citation.] . . . .' " (*Id.* at p. 759 [86 L.Ed.2d at pp. 602–603].) "In contrast, speech on matters of purely private concern"—while "not totally unprotected"—"is of less First Amendment concern." (*Id.* at pp. 759, 760 [86 L.Ed.2d at p. 603].) When such speech— for example, as in defamation or the intentional infliction of emotional distress—causes damage, civil sanctions may be imposed because " '[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. . . .' [Citation.]" (*Id.* at pp. 760, 761 [86 L.Ed.2d at pp. 603, 604].)

Here, defendant's speech was between purely private parties, about purely private parties, on matters of purely private interest. Thus, this case is " 'wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling.' [Citation.]" (*Dun & Bradstreet v. Greenmoss Builders, supra,* 472 U.S. at p. 760 [86 L.Ed.2d at p. 603]); and the trial court properly considered defendant's speech in determining whether to issue injunctive relief pursuant to Code of Civil Procedure section 527.6.

Nevertheless, defendant argues the court erred in considering, as evidence of harassment, the lyrics that defendant quoted in his "Dear Bev" letter. This is so, he argues, because song lyrics are entertainment protected by the First Amendment. (See *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 999 [249 Cal.Rptr. 187] ["First Amendment guaranties of freedom of speech and

expression extend to all artistic and literary expression, whether in music, concerts, plays, pictures or books"].)

However, as expressed in words of the song "Fair Warning," by Todd Rundgren, "You know, wishing won't make it so." By including the lyric in his "Dear Bev" letter, defendant was not singing or otherwise attempting to entertain. He used the lyric to ridicule and annoy plaintiff. They were not constitutionally protected in this context.

B

Defendant's assertion that the no-contact order violates his right to freedom of association reflects a juvenile view of the First Amendment.

■ We categorically reject the absurd suggestion that defendant's freedom of association trumps a parent's right to direct and control the activities of a minor child, including with whom the child may associate. (*Troxel v. Granville* (2000) 530 U.S. 57, 65–66, 72 [147 L.Ed.2d 49, 56–57, 60, 120 S.Ct. 2054]; *Gibson v. Gibson* (1971) 3 Cal.3d 914, 921 [92 Cal.Rptr. 288, 479 P.2d 648]; *Emery v. Emery* (1955) 45 Cal.2d 421, 429–430 [289 P.2d 218]; *Burge v. City & County of San Francisco* (1953) 41 Cal.2d 608, 617 [262 P.2d 6].) "The liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." (*Troxel v. Granville, supra,* 530 U.S. at p. 65 [147 L.Ed.2d at p. 56].) Whether a child likes it or not, parents have broad authority over their minor children. (*Id.* at p. 66 [147 L.Ed.2d at p. 57].) The "fundamental right of parents to make child rearing decisions" includes deciding who may spend time with a minor child. (*Id.* at pp. 72–73 [147 L.Ed.2d at p. 61].)

■ Not only do parents have a constitutional right to exercise lawful control over the activities of their minor children, the law *requires* parents to do so. (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 570–575 [20 Cal.Rptr.2d 341, 853 P.2d 507]; Pen. Code, § 272, subd. (a)(1), (2) [parents of a child "under the age of 18 years shall have the duty to exercise reasonable care, supervision, protection, and control over their minor child" so as not to "encourage" or "cause" the child to "become or to remain a person within the provisions of Section 300 [juvenile dependency], 601 [habitually disobedient or truant], or 602 [juvenile delinquency] of the Welfare and Institutions Code" and are subject to criminal punishment for a violation of that duty]; Ed. Code, §§ 48260.5, subds. (b), (c); 48293 [parents who fail to compel their child's attendance at school are subject to criminal prosecution]; see also Civ. Code, § 1714.1 [parents may be liable for the torts of their minor child]; Gov. Code, § 38772, subd. (b) [parents are jointly and severally liable with their

minor child for the child's defacement of property by graffiti]; Ed. Code, § 48904, subd. (a) [parents are liable for damages caused by the willful misconduct of their minor child in injuring or killing a pupil or school employee or volunteer, or in damaging property belonging to a school or school employee]; Pen. Code, § 490.5, subd. (b) [parents may be liable for petty theft committed by a minor child under their custody and control].)

By imposing upon parents a duty to exercise reasonable care, supervision, protection, and control over their minor child, Penal Code section 272 is intended to "safeguard children from those influences which would tend to cause them to become delinquent." (*People v. Calkins* (1941) 48 Cal.App.2d 33, 36 [119 P.2d 142]; Pen. Code, § 272, subd. (b)(5).) Ample evidence in this case showed that defendant was such a negative influence on Danielle.

In sum, defendant had no right to associate with plaintiff's minor child, Danielle, or to otherwise interfere with her parents' exercise of their right to control Danielle's activities.

### C

Also without merit is defendant's claim that his letters cannot support the injunction because they were "private letters . . . within the right of privacy protected by the constitutions of the United States and the State of California."

First, his premise is wrong. Substantial evidence supports the trial court's finding that this was not private correspondence to Danielle; defendant intended that plaintiff would read and be annoyed by them. In any event, defendant had no reasonable expectation of privacy in letters he wrote to a minor girlfriend who was subject to the supervision and control of parents entitled to search her room and possessions in hopes of finding out why she was misbehaving. Second, as we have explained, defendant had no right to communicate, privately or publicly, with Danielle against her parents' wishes.

### II

In another attack on the injunction, defendant contends there is no clear and convincing evidence to support it. He is wrong.

### A

Code of Civil Procedure section 527.6, subdivision (a) states: "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as

provided in this section." (Further section references are to the Code of Civil Procedure unless otherwise specified.)

Subdivision (b) of section 527.6 states: "For the purposes of this section, 'harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff."

■ A "credible threat of violence" is defined as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

■ A "course of conduct" that seriously alarms, annoys, or harasses a person and serves no legitimate purpose is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, fax, or computer e-mail. Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(3).)

■ Section 527.6 was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution." (Stats. 1978, ch. 1307, § 1, p. 4294; see *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 729–730 [255 Cal.Rptr. 453].) It does so by providing expedited injunctive relief to victims of harassment. (*Schraer v. Berkeley Property Owners' Assn., supra,* 207 Cal.App.3d at p. 730.)

### B

In defendant's view, there was "simply no evidence" that he made a "credible threat of violence" against plaintiff and her husband. He points to plaintiff's testimony that the threat to kill "came off like a joke." But he ignores that plaintiff also said she took the threat "very seriously." She explained: "I have to say that when you deal with [a] . . . seemingly imbalanced [*sic*] person, irrational person, there is no way of telling what that person is capable of doing."

We recognize that writings, such as defendant's, may use "symbolism, exaggeration, and make-believe" to shock or express anger. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 857 [123 Cal.Rptr.2d 193]; see also *In re George T.* (2004) 33 Cal.4th 620, 637 [16 Cal.Rptr.3d 61, 93 P.3d 1007].) However, as the trial court pointed out, in our post-Columbine High School world, fantastical threats that once were taken lightly as fancies of immature youth now cause reasonable persons to pause and even to become fearful. Such concern is particularly understandable where, as here, defendant's father testified that he has seen defendant "so upset that it was very hard for him to control himself."

Certainly, defendant's rabid dogs letter was not sufficient to constitute a criminal threat (Pen. Code, § 422) because it was not so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an immediate prospect of the execution of a crime that would result in death or great bodily injury.

Yet, we are not dealing with such a criminal sanction, but with an antiharassment law that contains a lesser standard—whether the threat was sufficient to "place a reasonable person in fear for his or her safety, or the safety of his or her immediate family . . . ." (§ 527.6, subd. (b)(2).)

We need not decide this question since defendant's letters and actions were "harassment" within the meaning of the injunction statute because they constituted a knowing and willful course of conduct directed at plaintiff that seriously alarmed, annoyed, or harassed her, that served no legitimate purpose, and that would cause a reasonable person to suffer substantial emotional distress. (§ 527.6, subd. (b)(3).)

## C

Defendant raises a two-fold argument that the evidence fails to establish a course of conduct within the meaning of the antiharassment statute.

First, he contends that three letters, written to Danielle not plaintiff, are insufficient to constitute a course of conduct, and that there was no evidence he would write more such letters. We disagree. As we have noted, the evidence shows that defendant wrote the letters with the intention that they would be discovered and read by plaintiff. And his actions were not limited to the three vile and vitriolic letters. Earlier, he had written letters to Danielle instructing her on retaliatory measures she could take against her parents for their restrictions on her. He also taunted plaintiff during his telephone conversation with her. It is readily apparent from the tone and content of his letters and telephone call that defendant had no intention of

ceasing his behavior toward plaintiff. Thus, we have no trouble concluding that all of his actions constituted a course of conduct, i.e., "a series of acts over a period of time, however short, evidencing a continuity of purpose . . . ." (§ 527.6, subd. (b)(3); cf. *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4 [260 Cal.Rptr. 253].)

Therefore, we turn to defendant's claim that his conduct did not constitute harassment within the meaning of the statute. This is so because, he says, his conduct would not have seriously alarmed, annoyed, or harassed a reasonable person. Quoting out of context language from *Schild v. Rubin* (1991) 232 Cal.App.3d 755, 763 [283 Cal.Rptr. 533], he argues a reasonable person " 'must realize that complete emotional tranquility is seldom attainable, and some degree of transitory emotional distress is the natural consequence' " of parenting a teenage child. However, *Schild v. Rubin* involved a complaint by homeowners that the noise created by their neighbors' children playing basketball for up to 30 minutes in the neighbors' backyard interrupted the homeowners' Saturday and Sunday afternoon naps "and, in general, interfered with their ability to rest and relax in their own home." (232 Cal.App.3d at p. 758.) It was with respect to this activity the court correctly observed that a degree of transitory annoyance "is the natural consequence of living among other people in an urban or suburban environment." (*Id.* at p. 763.)

Surely, defendant cannot expect us to equate his contemptuous conduct with the act of children bouncing a basketball for no more than five to 30 minutes, three to five times a week. (*Schild v. Rubin, supra,* 232 Cal.App.3d at p. 758.)

Defendant truly is living in a fantasy world in claiming that no reasonable parent of a teenage daughter would have been seriously alarmed, annoyed, or harassed by his letters and conduct. Even his trial attorney—now appellate attorney—admitted while defending this case in the trial court: "I'd be enraged if I got a letter like that, really angry."

Without doubt, defendant's socially unacceptable course of conduct would have seriously alarmed, annoyed, or harassed a reasonable person, and would have caused a reasonable person to suffer substantial emotional distress. (§ 527.6, subd. (b); *Schild v. Rubin, supra,* 232 Cal.App.3d at pp. 762–763.)

Equally without merit is defendant's claim that the evidence is insufficient to find plaintiff actually suffered substantial emotional distress.

Defendant repeatedly undermined plaintiff's efforts to deal with her daughter's behavioral problems that began after Danielle became defendant's

girlfriend. Among other things, defendant told plaintiff that if she persisted in exercising parental authority to stop her daughter from skipping school and receiving failing grades, he would cause Danielle to skip more classes. Defendant laughed at plaintiff, ridiculed her intelligence and expressions of concern for Danielle, and described plaintiff in abhorrent terms, including calling her a " 'psychotic fucking whore' " who should "keep fucking yourself in the ass." He made a sexual innuendo about plaintiff's daughter, saying, "I like the way she tastes," and concocted a scenario in which he would provoke plaintiff to hurt him, then sue her and use the money to marry Danielle. Defendant even urged Danielle to contemplate killing her parents with him. And he sought to make it clear that Danielle was under his influence, rather than plaintiff's control, and that he intended to keep it that way. Defendant even taunted plaintiff by saying that he had a "good lawyer" and plaintiff could not get a restraining order because the "judge will laugh at her."

Well, the trial court did not laugh, nor do we. Plaintiff's statements and demeanor in court demonstrate that defendant caused her substantial emotional distress, and that the injunction was appropriate and necessary.

### III

In his last challenge to the injunction, defendant asserts that it is void because it does not contain an expiration date.

█ An injunction issued pursuant to section 527.6 can have a duration of not more than three years. (§ 527.6, subd. (d).) In orally announcing its decision, the trial court specified that the injunction would be for three years. The court's written order is on a form, approved by the Judicial Council, which has a space for an expiration date and states that if no date is present, then the order expires three years from the date of issuance. Since the court did not enter an express expiration date, the order expires three years from the date of issuance and the written order conforms to the court's oral pronouncement of its decision. Hence, it is not void as defendant claims.

Nevertheless, we conclude that the expiration date of the order must be modified to expire on June 14, 2005, when Danielle turns 18 years of age and becomes an adult. She will then have the right and responsibility to make her own decisions; her parents' role will become one of influence and persuasion, rather than direction and control. Of course, Danielle could seek to renew the injunction for a period beyond her 18th birthday. (§ 527.6, subd. (d).) But that would be a matter of her choice, not of her parents' choosing.

## DISPOSITION

The injunction is modified to expire on June 14, 2005, and is affirmed as modified.

Hull, J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 27, 2005.