Filed 7/23/25  H.S. v. A.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| H.S., | C095425 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2021-70008487-CU-HR-GDS) |
| v. | |
| A.C., | |
| Defendant and Appellant. | |

This case arises from a civil harassment restraining order (CHRO) (Code Civ. Proc.,[1] § 527.6) issued to protect H.S.[2] from A.C.  The parties first came into contact

---

[1]     Undesignated section references are to the Code of Civil Procedure.

[2]     To protect their privacy, we refer to the parties by their initials.  (Cal. Rules of Court, rule 8.90(a)(1), (b)(5), (10) & (11).)  Further undesignated rule references are to the California Rules of Court.

1

when A.C. focused her amateur investigative reporting on H.S.'s personal life and business activities. A.C. dedicated an Instagram page to reporting on H.S., which accumulated thousands of followers. While much of the evidence and argument offered in the trial court concerned A.C.'s allegedly defamatory reporting on H.S., the trial court recognized there had been no judicial determination concerning the veracity of those statements and thus focused on A.C.'s speech and conduct that would constitute harassment regardless of a finding on the truth of the matters at issue. On that basis, the court determined that A.C. engaged in a course of behavior warranting the CHRO.

A.C. appeals in propria persona, raising multiple arguments that fall into four main categories:[3] (1) her speech was protected, (2) substantial evidence does not support the trial court's order, (3) the court improperly limited her cross-examination, and (4) H.S. should not have been awarded attorney's fees. H.S. has not filed a responsive brief, but A.C. bears the burden of demonstrating prejudicial trial court error. (Cal. Const., art. VI, § 13.) We shall affirm.

## BACKGROUND

The evidentiary hearings concerning H.S.'s CHRO request spanned five days over a period of four months. A.C. obtained settled statements for the first two hearings (rules 8.121, 8.130 & 8.137), and court reporters captured the remaining three hearings. This summary is comprised of the evidence presented at these hearings and the parties' filings. Consistent with the trial court's approach in this case, this factual summary focuses on the portion of the parties' dispute that does not require a prior adjudication of the truth of H.S.'s alleged actions and attendant possible defamation. We include some information concerning the larger dispute only for context.

---

[3]    A.C.'s argument that the trial court failed to make credibility determinations is both belied by the record and unsupported by citations to legal authority, such that we will not address it further.

2

A. *The CHRO Petition and Associated Temporary Restraining Order*

In early January 2021, H.S. requested the CHRO, asserting A.C. harassed him directly and indirectly through her Instagram " 'hate page' " that disparaged H.S. (including his businesses) and called her Instagram followers to action. As a result, H.S. had received "credible threats of death, violence, and obscenities." H.S. complained that A.C. and her followers caused him extreme emotional distress "due to the threats of death, violence, and constant harassment and libelous claims about [his] business. . . ." H.S. had suffered sleep disturbance, loss of appetite, and business losses. The harassment began in February 2020 and continued through January 5, 2021, with A.C. and her Instagram followers spreading "false and misleading information" about H.S. and his companies, as well as A.C. and her followers sending "rude, threatening, violent, and obscene" Instagram messages.

The trial court partially granted H.S.'s request for a temporary restraining order (TRO), denying the portion pertaining to A.C.'s online posting of false or misleading information. The court noted, H.S. "requests an order prohibiting [A.C.] from publishing false or misleading information and to remove statements and posts of violence, harassment, or those that demean or disturb the peace of [H.S.]." The court denied the first part of the requested TRO as a prior restraint on speech and the second part as overly broad. The court granted the remaining personal conduct orders and prohibited A.C. from coming within 100 yards of H.S., his home, business, and vehicle. A.C. was further prohibited from taking "any action to obtain [H.S.'s] address or location."

B. *Instagram's Operation & A.C.'s Instagram Page*

According to evidence offered to educate the trial court, tagging a person in a post on Instagram results in a notification in that person's activity feed. Any Instagram user may follow another user unless the Instagram account is private, in which case, the private account holder must accept the request. Material posted to public Instagram accounts could be viewed by anyone, even if that user was blocked by the page's

controller. Instagram also features a direct messaging option that enables users to message anyone following their account. When direct messaging a user who does not follow the sender, the person receiving the message must accept it. Once initiated, the conversation does not restrict the messages that may be sent. Stories posted on Instagram disappear within a day unless they are permanently published, but the stories are maintained in the poster's archives.

A.C. owned the Instagram page "People of Sacramento_Scams," which added the word "scams" to a posting of H.S.'s business. She admitted the posts from that Instagram page belonged to her. Although A.C. used the word "private" when discussing her Instagram page, she clarified it was a public account with 6,500 followers. A.C. saved her posts starting in February 2020 unless she was specifically told to take something down. In addition to her own content, A.C. admitted to reposting content from two meme accounts dedicated to "roasting" H.S.

While not an Instagram follower of A.C., H.S. received the complained-of public posts from his followers on Instagram and by being tagged in the post. H.S. further received notifications from different Instagram accounts concerning A.C.'s posts during the trial court proceedings. H.S. considered A.C.'s Instagram posts direct communications.

C.    *A.C.'s Amateur Online Reporting*

A.C.'s online amateur reporting began in February 2020 after H.S. opened an animal shelter allegedly in violation of local zoning ordinances and without appropriate legal paperwork. A.C. asserted this business was really an illicit " 'puppy flipping' " operation and that community concerns across numerous social media platforms grew over time. H.S. served A.C. with a "cease-and-desist" letter in March 2020 complaining of A.C.'s libelous social media posts and copyright infringement. A.C., however, believed the letter "was purely and simply a shakedown attempt," and A.C. shared the letter with her social media audience. Ultimately, the animal shelter closed.

4

A.C. also posted concerning H.S.'s alleged hypocrisy from March to December 2020; specifically, that H.S. made social media posts supporting public health officials and pandemic restrictions but then kept his business open selling t-shirts and masks. Further, A.C. asserted that a review of social media posts by H.S., his friends, and relatives showed noncompliance with and contempt for COVID-19 pandemic rules and directives. A.C. also criticized H.S. for attending a " 'super-spreader' " party on New Year's Eve, which was widely denounced on local news media. A.C. also posted about H.S.'s alleged illicit fundraising and promoting for-profit businesses using his nonprofit Instagram account, which she reported to "proper agencies." While difficult to estimate, A.C. believed she posted about H.S. a couple of times a week, including following the issuance of the TRO. She asserted H.S. was a "public figure" with 150,000 followers and was the self-proclaimed " 'Ambassador of Sacramento.' " While A.C. represented that her Instagram page was inactive for portions of 2020, H.S. testified that "[p]eople continued to send [H.S.] things from [A.C.'s] page on a weekly or daily basis."

D.      *The June 2020 In-Person Meeting and Associated Messages*

The only Instagram direct messages between H.S. and A.C. occurred between June 4 and June 13, 2020. H.S. reached out to A.C. by direct message, complaining that her conduct was "hurtful" and causing him "extreme anxiety." H.S. proposed they meet in person to clear the air so she would stop. Initially, A.C. was not open to meeting, stating, "I would be a fool to meet you in person without an attorney & security. But I'm happy to do it here, in writing." However, the two did meet on June 12, 2020.

According to H.S., he did not know A.C. was coming to meet with him and was surprised and scared by her arrival. H.S. was speaking with a client in a parking lot when A.C. sped into the parking space where H.S. had been standing. Her tires squealed, and he had to quickly move to avoid being hit. When she stopped, A.C. flicked a lit cigarette out of her car window at him, hitting his feet, and said, " 'Oops, sorry.' " A.C. yelled at

5

him about someone attacking her or her children and was very hostile. H.S. did not know what A.C. was capable of and feared for his life. He reported this incident to the police.

A.C. denied threatening H.S., explaining that she calmly pulled into a parking space and waited for H.S. to finish the conversation he was having. While she waited, she took a few pictures of herself and her location to share with her husband. A.C. denied that her tires squealed, that she tried to hit H.S. with her car, or that she threw a lit cigarette at him. A.C. acknowledged dropping a lit cigarette from her car window, which "bounc[ed] across the parking spot." She apologized, and H.S. finished his conversation. The two then spoke for about 45 minutes, agreeing she would take down her Instagram page if H.S. convinced his friend to take down a " 'hate page' " about her. However, the agreement fell apart, and A.C. alleged that H.S. filed a false police report in retaliation.

E.    *Posts Belittling H.S. for Seeking Police Assistance*

A.C. made several Instagram posts berating and belittling H.S. for contacting the police and sending a cease-and-desist letter. One of A.C.'s posts said, "Hold up [H.S.]. [¶] Did you amend the report to tell the cops about the podcast you made about me? [¶] Kiiiiiinda throws out your whole 'she's bullying me and won't stop' defense. [¶] Lmao. He called the cops. Lmao." When asked about the post, A.C. explained she was monologuing for her audience and being facetious, rather than speaking directly to H.S.

Another Instagram post included a portion of the police report H.S. had filed about A.C. A.C. superimposed a laughing GIF and text stating, "Lmaooooo you really called the fucking COPS for an internet beef!!!????? Was that before or after you said you were suing me!??????" A.C. further posted about the second police report H.S. filed concerning A.C., superimposing over the report, "Lmaoooooooo the Board of TPOS sent me my cease & desist letter on MARCH 3rd. [¶] On March 4th I said FUUUUUCK YOUUUUUU [¶] On March 8th [H.S.] BITCHASS CALLED THE COPS." A.C. clarified that she told her "audience fuck you in his general direction" and was again

6

being "facetious." In addition to these names, A.C. also called H.S. misogynistic, a compulsive liar, and "a dirty, fucking bitch-ass rat."

A.C. also posted on Instagram about her not calling authorities stating, " 'Literally everyone knows who I am and where I live after the past year, my shit is armed and ready, you random filter-using psycho, hey [H.S.], should I call the cops? Oh, wait, nope. I'm not a bitch ass.' "

F.    *A.C.'s Team and the Evidence of Surveillance*

A.C. asserted that H.S.'s refusal to respond to citizens concerned about the animal shelter coalesced into the formation of A.C.'s " 'team' " consisting of hundreds of people who sent her content from H.S.'s social media sites, which she would use to "roast" him.

A "surveillance" photograph from an unknown source capturing the end of the June 2020 in-person meeting was submitted into evidence. A.C. posted this picture on Instagram with text stating, " '[H.S.] swore under oath and under penalty of perjury several times both to the Court and Sac Police Department his version of the meeting which was outrageous and demonstrably false. . . . He was unaware that this surveillance was occurring and I love that for him.' " A.C. stated she received the photograph from a fake Instagram account, which then disappeared, and she was not aware of the surveillance. She no longer had the Instagram username information and did not provide the information to her attorney.

A.C.'s Instagram post also stated, " 'We have been sitting on this, but the judge forced us to submit all of our evidence by May 28th so we couldn't leave it as a surprise like we wanted to.' " A.C. explained that the "we" in her post referred to her team, but she denied that any of them had contacted H.S. or sent him death threats. She refused to identify any of her "team." A.C. claimed she rarely instructed them, but acknowledged posting a " 'Homework assignment for the team.' " When asked to explain how the photograph was taken and provided to her, A.C. pointed "to the public interest of this all and [her] giant audience." She claimed that 500 people had watched the first court

7

hearing, and "someone" decided to help. A.C. later stated the anonymous Instagram user had explained over messaging that the photographer happened to see A.C. and H.S., recognized them from "the social media nightmare," and took a picture, which was later shared with her. A.C. denied regularly driving by H.S.'s business.

H.S. further complained that A.C. posted on Instagram his parents' full names and addresses. A.C. also posted on Instagram pictures of H.S.'s home, work, his parents' home, and his grandparents' neighborhood. A.C. denied these allegations, saying she only posted a certificate related to H.S.'s business that happened to have his parents' address on it. A.C. denied that her interest in H.S.'s "clothing, vehicles, eating habits, and residence" constituted "excessive surveillance." Nonetheless, she admitted to paying for a public records platform search to obtain the family lineage of H.S. and his attorney and claimed to have identified all of their family members (including grandparents and cousins) going back to "Beit Hanina, Palestine."

G.    *The Gang Snitch Instagram Post*

Sometime after the trial court issued the TRO, A.C. posted on Instagram an exhibit of a picture of H.S. with two of his clients, including a Grammy award-winning artist. In this Instagram post A.C. stated: " 'Hey [H.S.], [¶] I'm gonna show the judge all the pics everyone who doesn't have a TRO reposted of you in your full Blood colors, and the shirts you designed for the 70 dudes in that video, and your store's Instagram tagging 'SACTOWN x BOMPTON'and you can tell her again how afraid you are of me. [¶] [H.S.]-did you tell all the Bloods that day about how you are a snitch, who files fake police reports? And about how terried [*sic*] you are of a middle-aged suburban housewife talking about your defunct charity on Instagram. Does YG know what a bitch you are? [¶] Maybe I should tell all those dudes not to share too much info around you, since you love clearly talking to cops."

H.S.'s expert witness, Dr. Jesse De La Cruz, opined that A.C.'s comments "could endanger" H.S. Dr. De La Cruz testified that if gang members saw the Instagram post of

8

the picture of H.S. with two of his clients and believed H.S. was a "snitch," it could result in his serious injury or death. Dr. De La Cruz did not necessarily consider it dangerous for an individual to socialize with gang members, but the information in the picture was dangerous for the person being posted about. Further, gang members did not look favorably upon individuals who contacted the police.

H. *The July 2nd Incident*

On July 2, 2021, prior to the day's scheduled court hearing, H.S. recorded on his cell phone a video of what he claimed was A.C. surveilling him at approximately 8:15 a.m., and that video was played for the trial court. H.S. posted on Instagram about getting coffee near his residence, specifically posting a video taken from the alley where he parked.[4] Approximately 10 minutes later, while in his car, H.S. was trying to leave the alley across the street from the coffee shop, when A.C. blocked his car with her car. A.C. appeared to be recording him. She laughed, made jokes, and exclaimed, " 'Oh, this is fucking hilarious.' " H.S. was forced to back up because A.C. refused to move. Encountering A.C. just blocks from his home and within an hour of the court hearing was frightening. H.S. believed A.C. stalked him often.

A.C. testified this encounter was by chance, explaining she took the wrong exit and then a wrong turn on the way to her attorney's office from her home. A.C. complained that H.S.'s car was blocking the alley, that she had the right of way, and that he refused to yield, instead recording her with his cell phone. A.C. explained she could not back up because of traffic, which she claimed passed before the video began. A.C. tried to record the encounter but failed to hit the start button. A.C. yelled, using profanities to get H.S. to back up. A.C. denied she was surveilling or stalking H.S., stating she panicked because she believed H.S. had a conceal-and-carry permit. A.C.

---

[4]    A screenshot depicting a portion of the video is in evidence, but the video itself was deleted as part of Instagram's normal operation.

9

accused H.S. of stalking her to frame her, arguing that H.S. should have been in Stockton with his attorney.

I.     *The Third-Party Messages*

H.S. repeatedly complained in written filings and during court hearings that he had received multiple death threats from " 'anonymous messengers' " who said they were sent by A.C., but he filed no exhibits reflecting those threats. H.S. did submit exhibits showing direct Instagram messages saying: "Wear da [*sic*] shades & and red tee" with a clown emoji. Another individual directly messaged H.S., "Fearful for your life [three laughing emojis] you're a bitch." Another user commented on one of A.C.'s Instagram posts, "Someone should fuck this dude up if you see him in public."

A.C. was not concerned about these reactions or that her Instagram posts might be influencing people to act against H.S. A.C. maintained that she was only speaking on her private Instagram page, had not tagged anyone, and had only communicated directly with H.S. once. A.C. denied that her 6,500 followers would communicate her messages to H.S., although she acknowledged telling those followers to direct message H.S. and tell him "he's an ass-whole [*sic*]." A.C. disclaimed responsibility, instead blaming H.S.'s activities.

J.     *A.C.'s Posts Concerning the CHRO Proceedings and In-Hearing Conduct*

At the second hearing, it came to light that A.C. had posted on Instagram a video of a portion of the first hearing, allegedly recorded by "citizens." The trial court admonished A.C. that recording and distributing images from court proceedings without permission was illegal.

At a later court hearing, A.C. refused to admit that she had been posting on Instagram almost daily, stating she had been "extremely cautious" since the last hearing, given the trial court's instructions, but had kept her audience informed of public interest information derived from her subpoena duces tecum. However, H.S. presented evidence showing that A.C. had not complied with the court's order to remove all posts concerning

10

the prior hearings in the matter. In response, A.C. said she complied with the court's order, but then reposted a picture because that picture "was on the internet so [A.C.] figured if it's still out there, then [she] could re-post it." A.C. later stated that the post was from before the last hearing and that she failed to take it down because she had "thousands of screenshots" on her Instagram highlights page and must have missed it. A.C. continued violating the court's order that "this proceeding cannot be recorded, reproduced, [or] republished from some other source" by posting what she represented were direct quotes of the proceedings prior to the transcript being prepared. She also reposted materials by posting her "removal" of previous posts, thus republishing those posts.

A.C. affirmed that she filmed and celebrated being served with the TRO. She further admitted being furious about the court case, calling it "absurd," and had dubbed herself an anti-influencer. The trial court repeatedly admonished A.C. for laughing, gesturing, and making faces during the court proceedings.

### K. *H.S.'s Emotional Distress*

A.C. began posting on Instagram about H.S. after the ribbon-cutting ceremony for the dog program at H.S.'s boutique retail clothing location. The subject of the Instagram posts then expanded from animals to attacking H.S.'s lifestyle, friends, and posting his parents' address. A.C.'s posts calling him names such as " 'bitch-ass' " and " 'snitch' " as well as her posting pictures of H.S.'s home, work, parents' home, apprised her followers of H.S.'s whereabouts and had caused H.S. "mental anguish."

A.C.'s conduct increased H.S.'s anxiety from a level one to a level 10 and had resulted in panic attacks and sleep disturbance, including nightmares. His first significant symptoms began in March 2020 and included having to cut a business trip short because of a panic attack. H.S. suffered from daily anxiety attacks, and some days H.S. could not get out of bed because of A.C.'s actions. H.S. testified that A.C. was a threat to his life and that her conduct would continue if not restrained.

11

H.S. started therapy with Karen McCrary, a Licensed Marriage and Family Therapist. McCrary saw H.S. twice for the "extreme emotional distress" caused by A.C. and diagnosed him with anxiety. McCrary reviewed numerous Instagram posts by A.C. and opined that cyberbullying can impact mental health. McCrary was most concerned with the comment on A.C.'s post that indicated someone should " 'F this dude up' " and that " 'Sacramento is coming for you. If people don't get justice now, they will in the future.' " This concerned her because this "copycat effect" would affect H.S.'s emotional well-being.

L.     *The Trial Court's Order Granting the CHRO*

On November 1, 2021, the trial court issued its written ruling and associated order granting the CHRO for a term of three years. The court first found clear and convincing evidence that A.C. stalked H.S. as well as recklessly incited and engaged others to harass H.S. In so finding, the trial court distinguished between A.C.'s speech that may have been constitutionally protected and her "conduct that went beyond engaging in protected speech or expression." The court reasoned, " 'speech that constitutes "harassment" within the meaning of [Code of Civil Procedure] section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief.' [Citation.] . . . The right to free speech 'does not include the right to repeatedly invade another person's constitutional rights of privacy and the pursuit of happiness through the use of acts and threats that evidence a pattern of harassment designed to inflict substantial emotional distress.' [Citation.] In sum, threats of violence, or speech which intentionally incites others to engage in harassment toward another, do not fall within the protection of the First Amendment."

Moreover, the trial court highlighted that it was not deciding whether A.C. had defamed, or whether H.S. engaged in improper business practices, or was a public figure. Rather, the court only determined whether A.C. harassed H.S. and whether that harassment was likely to continue in the absence of a restraining order. In reaching its

12

determination, the court made an adverse credibility finding concerning A.C.'s explanation of the July 2, 2021, incident and also credited H.S.'s "testimony regarding the substantial emotional distress he experienced, including loss of sleep, anxiety and depression" due to A.C.'s conduct and that A.C.'s "course of conduct would cause a reasonable person to suffer substantial emotional distress."

The CHRO added to the terms of the TRO, prohibiting A.C. from *directly or indirectly* harassing, intimidating, stalking, threatening, or disturbing the peace of H.S. The CHRO also prohibited A.C. from contacting H.S., *including via social media*. The CHRO would expire on November 1, 2024.[5] The court also awarded H.S. attorney's fees in an amount to be determined. A.C. timely appealed.[6]

## DISCUSSION

" 'Section 527.6 was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution." [Citations.] It does so by providing expedited injunctive relief to victims of harassment.' " (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227, (*Parisi*); accord, *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412 (*Brekke*).) "Under section 527.6, subdivision (a)(1), '[a] person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in' section 527.6. Section 527.6, subdivision (b)(3) defines ' "[h]arassment" ' in relevant part as 'a knowing and willful course of conduct directed at a specific person that seriously alarms,

---

[5]    We augmented the record on our own motion to include the trial court orders establishing that this CHRO is still in effect given H.S.'s pending motion to renew the CHRO. (Rule 8.155(a)(1)(A).)

[6]    After the appeal was taken, both parties sought extensions of time to file their briefs. Despite seeking and receiving numerous extensions of time stretching over several months, H.S. ultimately failed to file a respondent's brief, and the matter was deemed ready for assignment on April 7, 2025.

annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.' " (*E.G. v. M.L.* (2024) 105 Cal. App.5th 688, 698 (*E.G.*).)

Section 527.6, subdivision (b)(1), defines " '[c]ourse of conduct' " as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email." Notably, "[c]onstitutionally protected activity" is expressly excluded from "the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1).) "If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Id.*, subd. (i).)

"We review issuance of a protective order [under section 527.6] for abuse of discretion, and the factual findings necessary to support the protective order are reviewed for substantial evidence." (*Parisi, supra*, 5 Cal.App.5th at p. 1226; accord, *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.) In so doing, " '[w]e resolve all conflicts in the evidence in favor of . . . the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings.' " (*Parisi,* at p. 1226.) However, whether the facts construed most favorably in support of the judgment constitute harassment is a question of law subject to de novo review. (*R.D.,* at p. 188; accord, *Parisi,* at p. 1226.) Whether the complained-of-conduct falls outside of the relevant course of conduct because it is protected by the First Amendment is also subject to de novo review for which we independently review the record. (*Parisi,* at p. 1226.)

A.C.'s arguments in this in propria persona appeal fall into four categories: (1) her speech was and is protected by the First Amendment; (2) substantial evidence does not support the trial court's order; (3) the trial court's rulings prevented A.C.'s defense by

14

limiting her cross-examination of adverse witnesses; and (4) H.S. should not have been awarded attorney's fees. We will address her contentions to the extent they are raised in compliance with the rules of appellate procedure. (See, e.g., *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we do not consider all of the loose and disparate arguments that are not clearly set out in a heading and supported by reasoned legal argument"]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 [citations to the record must appear in both the summary of facts and argument portion of a brief]; rule 8.204(a)(1)(C) [any reference to evidence in the record must be accompanied by a citation to its location therein]; rule 8.204(a)(1)(B) [each point must be separately headed and supported by argument and authority if available].)

The fact that A.C. is representing herself does not alter the application of these rules. (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 524.) Rather, she is held to the same standards as a party represented by counsel. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.) Moreover, even though H.S. has not filed a responsive brief, A.C. maintains the burden of demonstrating trial court error that has prejudiced her. (Cal. Const., art. VI, § 13.) Having reviewed A.C.'s claims in light of the record and presumption in favor of the judgment (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762), we discern no trial court error.

A.      *The First Amendment and Evidence Supporting the CHRO*

Central to the propriety of the trial court's order granting a CHRO to H.S. is a determination of the nature of A.C.'s online speech. Specifically, whether it was constitutionally protected with a legitimate purpose. (*E.G., supra*, 105 Cal.App.5th at pp. 701-702.) A.C. maintains her Instagram posts reporting on H.S.'s allegedly illicit business activities related to matters of public concern protected by the Constitution. Matters of public concern go to the heart of First Amendment protection and are afforded the greatest protection. (*Snyder v. Phelps* (2010) 562 U.S. 443, 451-452 (*Snyder*).) In contrast, matters of private concern receive less rigorous protection because they do not

threaten meaningful, free, and robust debate of public issues. (*Id*. p. 452; accord, *Brekke, supra*, 125 Cal.App.4th p. 1409.)

"Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' [citation], or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " (*Snyder, supra*, 562 U.S. at p. 453.) "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.' " (*Ibid.*) Nonetheless, harassing speech without a legitimate purpose is not protected by the Constitution. (*E.G. v. M.L., supra*, 105 Cal.App.5th at p. 702.)

"Deciding whether speech is of public or private concern requires us to examine the ' "content, form, and context" ' of that speech, ' "as revealed by the whole record." ' [Citation.] As in other First Amendment cases, the court is obligated 'to "make [an independent examination of the whole record"] in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." ' [Citation.] In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." (*Snyder, supra*, 562 U.S. at pp. 453-454.)

Our review of the record reveals that A.C.'s posts on her public Instagram page concerning whether H.S. was engaged in illicit business practices, for example, allegedly operating an illegal animal shelter and/or misusing charitable donations, appear to implicate a matter of public concern over which the First Amendment would afford substantial protections. (*Snyder, supra*, 562 U.S. at pp. 453-454.) Consistent with this, and because there had been no adjudication of the veracity of A.C.'s statements, the trial court expressly did not utilize these posts to determine whether A.C. harassed H.S. We concur with this approach. (See, e.g., *E.G., supra*, 105 Cal.App.5th at p. 704 [alleged

16

defamation cannot be enjoined unless the statements were already judicially determined to be defamatory].)

However, it would be inappropriate to use the protections afforded to *some* of A.C.'s social media posts to insulate *all* of her posts. For example, A.C. has provided no authority establishing that her amateur reporting on A.C.'s business practices should be used to insulate her Instagram post taunting that she should tell the alleged gang members in a photo that H.S. was a "snitch," who filed fake police reports and loved talking to the police. Likewise, she has not explained how her posts mocking H.S. for seeking police assistance are protected speech, nor has she proven that her post soliciting her followers to send Instagram direct messages to H.S. telling him "he's an ass-whole [*sic*]" warrants protective treatment. Finally, A.C. has not explained the public interest in her posting H.S.'s parents' full names[7] as well as photographs of H.S.'s home, workplace, his parent's home, and his grandparents' neighborhood. Accordingly, we conclude this evidence may be considered in our substantial evidence review.

In addition to her Instagram posts, A.C.'s offline conduct supports the issuance of the CHRO. A.C. had hundreds of followers forwarding her information on H.S. so that she could "roast" him. It can be inferred that it was one of these individuals who surveilled A.C.'s unscheduled June 2020 meeting with H.S., a photograph of which was given to A.C. and submitted into evidence in these proceedings. At this meeting, A.C. sped into a parking spot, causing H.S. to jump out of the way. She then flicked a lit cigarette at his feet and screamed at him concerning a third party's behavior.

A.C. also contacted H.S. in July 2021 while the TRO was in effect. Following H.S.'s Instagram post about getting coffee, A.C. blocked H.S.'s egress from an alleyway

---

[7]     While A.C. explained she posted a tax document that reflected H.S.'s parents' address without an awareness that the address belonged to them, this does not explain away H.S.'s testimony that A.C. posted his parents' full names.

near the coffee shop, appearing to video record him. She shouted profanities at him and forced H.S. to move his car so that she could drive directly past him. A.C.'s explanation of this encounter was expressly discredited by the trial court as inconsistent with the cell phone video evidence.

Based upon this record, we conclude the trial court did not abuse its discretion in issuing the CHRO and that substantial evidence supports the trial court's finding that A.C. engaged in "a knowing and willful course of conduct" directed at H.S. "that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(3).) For more than a year, and in addition to the two in-person encounters described above, A.C. engaged in taunting posts addressing H.S. by name and encouraging others to contact and surveil H.S. on her behalf—which they did—thus directing her harassing conduct towards H.S. (See, e.g., *E.G. v. M.L., supra*, 105 Cal.App.5th at pp. 695-696 [TikTok and Instagram videos asking the public to make petitioner stop]; *Brekke, supra*, 125 Cal.App.4th at p. 1413 [correspondence transmitted to a daughter that was intended to be read by the mother].) Moreover, A.C.'s failure to honor the terms of the TRO, as well as the trial court's admonishments during the proceedings,[8] further support that A.C.'s harassment would continue without court intervention.

We also conclude that substantial evidence supports the trial court's determinations that A.C.'s conduct as described herein would cause a reasonable person emotional distress (§ 527.6, subd. (b)(3)) and that H.S. in fact suffered emotional distress as a result of A.C.'s conduct. H.S. presented evidence that he suffered mental anguish,

---

[8] These included A.C. repeatedly making faces during trial court proceedings (which were visible to all due to the Zoom format) despite being instructed not to and posting pictures from the court proceedings despite being repeatedly instructed by the trial court that such conduct was unlawful.

anxiety, and sleep disturbance resulting from A.C.'s harassment. While it is possible that some of H.S.'s distress may have come from protected activity, A.C. has not met her burden on appeal to establish that he did not also suffer emotional distress from her unprotected speech and conduct.

B.    *Limitation of Cross-Examination*

We likewise find no merit to A.C.'s arguments that the trial court prevented her from mounting a defense by limiting her cross-examination of adverse witnesses, a claim which we review de novo. (*D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 634.) Section 527.6, subdivision (i), provides in pertinent part that "the judge shall receive any testimony that is relevant, and may make independent inquiry." Presentation of live witnesses on relevant issues is part of a respondent's right to contest the petitioner's restraining order request. (*Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 732-733; *D.Z.*, at p. 635.)

Here, the trial court conducted extensive proceedings spanning five days, including live testimony and hundreds of exhibits submitted by the parties. Our review reflects the trial court's exercise of discretion to limit A.C.'s presentation of evidence and cross-examination to relevant, non-cumulative issues. A.C. has not established through argument and citation to relevant authority (*Provost v. Regents of University of California, supra*, 201 Cal.App.4th at p. 1294; rule 8.204(a)(1)(B)) that any of the trial court's evidentiary rulings limiting A.C.'s cross-examination to relevant issues as part of its control of evidence in this expedited case was in error. (§ 527.6, subd. (i).)

C.    *Attorney's Fees*

As part of the CHRO, the trial court awarded attorney's fees and costs to H.S. in an amount to be determined later. (§ 527.6, subd. (s) ["The prevailing party in an action brought pursuant to this section may be awarded court costs and attorney's fees, if any"].)

We have concluded that the trial court properly issued a CHRO, and A.C. has not shown that the trial court abused its discretion in awarding attorney's fees and costs to

19

H.S. as the prevailing party.  (See *Elster v. Friedman* (1989) 211 Cal.App.3d 1439, 1443 [trial court's determination of attorney fees pursuant to section 527.6 upheld absent a "manifest abuse of discretion"].)  A.C.'s arguments concerning specific costs and expenses identified by H.S. following the order granting attorney's fees in an amount to be determined are premature.

DISPOSITION

The judgment is affirmed.  H.S. shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


_____\s\_____
                                                              Krause, J.



We concur:



_____\s\_____
Mauro, Acting P. J.



_____\s\_____
Duarte, J.