Filed 8/29/25  P. v. Scripps Health CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SCRIPPS HEALTH, <br><br> Defendant and Respondent. | D084069 <br><br><br> (Super. Ct. No.:  37-2021-00036840-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Mara W. Elliott and Heather Ferbert, City Attorneys, M. Travis Phelps, Assistant City Attorney, Mark Ankcorn, Chief Deputy City Attorney, and Kevin B. King, Deputy City Attorney, for Plaintiff and Appellant.

Horvitz & Levy, Mark A. Kressel and Gaspard Rappoport; Higgs Fletcher & Mack, William M. Low, Paul J. Pfingst, Jacob T. Spaid and Steven M. Brunolli, for Defendant and Respondent.

The People appeal a judgment following a bench trial.  They contend (1) that the trial court made factual findings that were not supported by substantial evidence and (2) that the trial court abused its discretion in

denying a motion for leave to designate an expert witness after the deadline to do so had passed. We disagree with both contentions. Hence we affirm.

## I.

## BACKGROUND[1]

At the heart of this case is a man, J.N., who the People have described as having "a troubling medical history of schizophrenia, delusions, long-term depression, command hallucinations to kill himself, and suicidal behavior including overdosing, attempting to get hit by a truck and cut[ting] his arms, and threatening to cut his throat with a knife."

### A. J.N.'s Admission to the BHU

In early September 2019, when J.N. was 67 years old, Connie Johnson, an investigator at the Office of the City Attorney (OCA), encountered him naked, delusional, and incoherent in a bedbug-infested independent living facility (ILF). The encounter led to J.N. being admitted to the Scripps Mercy Behavioral Health Unit (BHU), a locked facility within Scripps Mercy Hospital, where he remained—receiving treatment from a Scripps Health (Scripps) medical team—for the next 100 days.

### B. Appointment of a Conservator

Several weeks into J.N.'s stay at the BHU, one of the physicians treating him there—psychiatrist Smit Chauhan—recommended that J.N. be placed in a conservatorship. The county Office of the Public Conservator (OPC) agreed. Thereafter, in response to a petition by the OPC, Judge

---

[1] "Under the applicable rules of appellate review, we summarize the facts in the light most favorable to the judgment." (*E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 693, citing *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405 and *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787. "We describe conflicting evidence only as relevant to [the appellant's] contentions on appeal." (*E.G.*, at p. 693.)

2

Frederick Maguire entered an order in which he appointed public conservator Mark Sellers to be J.N.'s conservator. The order included a finding that "[a] Closed (locked) Treatment Facility" would be "[t]he least restrictive placement available and necessary to achieve the purpose of treatment for the conservatee."

## C. J.N.'s Discharge from the BHU

In mid-December Dr. Chauhan decided to discharge J.N., not to a locked treatment facility, but to New Horizons, an ILF.[2] Eight days later Johnson went to New Horizons and encountered J.N. filthy, unkempt, with feces on his bedding and on the clothes he was wearing, and unable or unwilling to respond when asked if he had been taking his medications.

## D. The Enforcement Action

After the post-discharge encounter described above, the OCA initiated this civil enforcement action on behalf of the People, asserting a single claim against Scripps under Business & Professions Code section 17200 (the Unfair Competition Law, or UCL). The thrust of the claim was that Scripps's conduct in discharging J.N. to an ILF instead of to a locked treatment facility constituted criminal and civil elder abuse, and a criminal and civil contempt of the court's conservatorship order, amounting to violations of the UCL.

During pretrial proceedings, the court ruled on numerous motions. Among these was a motion by Scripps seeking summary judgment and a motion (discussed *post*) by the People requesting leave to designate an expert witness after the deadline to do so had passed. The court denied each of these two motions. Thereafter, it presided over a five-day bench trial that included testimony from 12 witnesses.

---

[2] This was not the bedbug-infested ILF where Johnson had encountered J.N. three and a half months earlier, but rather a different ILF.

3

### 1. Testimony Regarding J.N.'s Progress During His Treatment at the BHU, and Regarding Outplacement

At trial Dr. Chauhan and BHU nurse Virtud Oloan testified that, during the period of time J.N. was being treated by Scripps, his physical and mental health significantly improved. He gained weight, he participated in therapeutic programs, he performed almost all activities of daily living, he started washing his own laundry, he began socializing with other patients, his judgment improved, and his understanding of his mental condition and treatment improved as well.

But, as time wore on, J.N. became increasingly depressed and frustrated at the duration of his confinement—which was about 10 times longer than that of the other patients whom he would see come and go. Thus, he began pressing the medical team to discharge him.

As J.N.'s depression deepened, Dr. Chauhan concluded that "continuing him on an inpatient unit was actually not benefiting him" and that, for this reason, a suitable placement outside of Scripps Mercy should be found for him. Outplacement options for a patient in a conservatorship can include, in descending order of restrictiveness: (1) a state hospital; (2) a closed (locked) facility, such as, for example, what is known in the industry as an institute of mental disease (IMD); (3) an open (residential) treatment facility; (4) a board and care or assisted living facility; (5) a crisis residential facility; and (6) an ILF. But—according to testimony of Scripps's expert witness—psychiatrist Michael Plopper, systemic regulatory, financial, and other types of

dysfunction[3] affecting the residential care facility industry often make it difficult to find suitable placements for individuals with severe mental illnesses. And, according to Dr. Chauhan, the medical team at Scripps ran up against this problem in its efforts to place J.N.:

> "Would I have wanted him to be on a high level of care? Of course. . . . My preferred choice was the higher level of care, a locked facility for . . . [a] certain amount of time, but those options were not available. We left no stone unturned in our efforts to find all the reasonable alternative disposition options.[4] And because the patient had significant progress . . . in his condition and his improvement of his symptoms, I believed that he deserve[d] a chance to be able to be discharged and work on [the] recovery phase of his treatment."

Ultimately, an ILF named New Horizons was the only facility the Scripps staff could find that would accept J.N. This particular ILF was owned and operated by Margie DeGuzman, a psychiatric nurse who interviewed J.N. at the BHU. DeGuzman told the Scripps team that she would ensure J.N. took his medications, and she gave the team the name of a pharmacy that she preferred to work with.

Dr. Chauhan was not alone in concluding it was appropriate to discharge J.N. to an ILF. Nurse Oloan concurred in this decision; and so, too,

---

[3]  In the statement of decision it entered at the conclusion of the trial, the trial court referred to the effects of this dysfunction as "the revolving door of crisis, treatment and relapse to which the profound shortcomings of the mental health 'system' described by Dr. Plopper consigned JN, Scripps Health, and all the other well intentioned players in this drama."

[4]  Witnesses in addition to Dr. Chauhan testified about extensive efforts Scripps undertook to find an IMD, a skilled nursing facility, a board and care facility, or an ILF that would accept J.N.

5

did Dr. Plopper.[5]  Nonetheless, Dr. Chauhan was not without *some* misgivings, and he shared these misgivings openly with the OPC:

[5]  Dr. Plopper testified that "it was appropriate . . . to discharge J.N. to an ILF under the[] circumstances."  In support of this opinion, he testified that:

> "[J.N. had] been in the hospital for three months.  He had the first month showed quite a bit of improvement due to medication for the most part, and then the ensuing two months had continued to improve.  He had achieved the equivalent in those latter two months of an IMD . . . at Scripps Mercy . . . [because] he had participated [there] in all the type of treatments he would have at the IMD.  And so he generally got that benefit of two more months of hospitalization.  So at that point, it really wasn't an issue anymore whether he needed to go to an IMD.  He had received the equivalent [of that] in the hospital.

> " . . . So . . . in the end [it] was felt that he had achieved sufficient benefit and was functioning well enough that he could do okay at an ILF with some [supportive services provided through the OPC].

> " . . . [H]e was assessed in terms of his ADLs [one's ability to perform what are known as basic activities of daily living], his general functioning, his ability to look at and manage medications, his ability to use a phone, his ability to dress himself, feed himself.  There are three meals . . . that were provided per day in [the New Horizons] ILF [to which J.N. was being discharged].  And it was felt that he had achieved sufficient benefit that he could succeed in this level of care with some supports."

> " . . . He used a walker[,] . . . was able to ambulate short distances without a walker[, and] . . . was assessed to be able to walk independently by physical therapy.

> " . . . [H]e had case management set up to help him to get to appointments.  He had . . . a psychiatry appointment [that Scripps had] made [for him] at Family Health Centers [scheduled for] three days after his discharge.  . . .  [A]ll in all, he was ready to take that next step and enter the community."

"Q. Do you recall having a discussion with anybody at the conservator's office in which you said you were concerned about J.N.'s ability to stay on top of his medications at an ILF facility?

"[¶ . . . ¶]

"A. Yes."

### 2. Testimony Regarding Post-discharge Problem with Medications

As it happened, J.N. did *not* stay on top of his medications. However, this was because he did not receive them. A nurse at Scripps had neglected to update the address field in Scripps's records for J.N., from "homeless" to the location of the New Horizons ILF; and, as a consequence, the pharmacy to which New Horizon's management had requested that J.N.'s prescription be sent never delivered the medications to him.[6]

### 3. Testimony Regarding Whether the OPC Agreed to J.N. Being Discharged to an ILF

A hotly disputed matter at trial (and a focus of this appeal) is the answer to the question: Did the OPC agree to J.N. being discharged to an ILF? Dr. Chauhan answered this question in the affirmative:

---

[6] Asked whether it would have been reasonable for Scripps to expect that an employee of New Horizons or of the pharmacy would have contacted it had there been a problem with delivery of the medications, Dr. Popper responded: "Yes." Referring to DeGuzman, the operator of New Horizons, he added: "[S]he's taken on a new resident. She's a psychiatric nurse . . . , so yeah, there should have been . . . an awareness that he did not receive his medications and he needs them. So that phone call could easily have been made and would have averted this problem." We find no explanation in the record as to why DeGuzman, who had told Scripps that she would ensure J.N. took his medication, failed to notice that J.N. did not have his medication and further failed to notice J.N.'s deterioration during the eight days he spent at her facility.

7

"Q. Did anyone at the conservator's office ever say, yes, we agree with placing J.N. at an independent living facility?

"A. Yes.

"Q. Who said that?

"A. Anna [Litwak]."

But Litwak, an investigator working for the OPC, emphatically disputed this:

"Q. In this conversation with Dr. Chauhan, did you ever express agreement for the plan to discharge J.N. to an ILF four days later?

"A. No, I totally disagreed with that plan.

"[¶] . . . [¶]

"A. . . . I thought it was unethical and wrong."

Indeed, so concerned was Litwak about the plan to discharge J.N. to an ILF that she immediately escalated the matter to her supervisor, Regina Koller, who (Litwak testified) "disagreed with that plan, too."

Koller did not testify at trial. But a note she had placed in J.N.'s OPC case file—which (together with notes placed in the file by Litwak) formed a part of trial exhibit no. 3—revealed that Koller had called Scripps to discuss the matter with BHU administrator Pam Gholson and that, during the discussion that ensued, Koller had "expressed [to Gholson] concern regarding medication management and lack of structure/support in a[n] ILF setting" and had "[s]uggested a case conference."

Litwak acknowledged that Koller's note did not expressly say Koller had told Gholson the conservator's office was opposed to discharging J.N. to an ILF. But she said that Koller suggesting a case conference to Gholson was the functional equivalent of Koller telling Gholson that Koller disagreed with the discharge plan.

8

Presented with Koller's note and asked if it was an accurate reflection of the conversation to which it referred, Gholson responded: "No."

> "Q. Why is that?
>
> "A. Because when I spoke to Regina [Koller], I gave her an outline of the plan, and then her response to me was that she would tell Anna [Litwak]. There was no discussion around that they did not want him discharged. That was never said.
>
> "Q. And your testimony is that she never suggested a case conference?
>
> "A. No."

Dr. Plopper also supplied testimony about Koller's note to the file. He said requesting a case conference about a discharge plan should not necessarily be interpreted as an expression of disagreement with the plan.

### 4.     Statement of Decision and Entry of Judgment

During the trial, the court prepared 13 single-spaced pages of notes to capture aspects of each of the 12 witnesses' testimony, including its perceptions regarding the credibility of six of the witnesses. Then, at the conclusion of the trial, the court incorporated those and other notes into a 38-page (double-spaced) statement of decision, in which it spoke approvingly of Scripps's conduct and determined that Scripps had not committed elder abuse, had not violated the conservatorship order, and had not run afoul of the UCL.

Regarding the treatment J.N. received at the BHU prior to his discharge, the court said:

> "Dr. Chauhan's testimony, which the court credited, was to the effect that he genuinely believed, based on his years of training and practice and the documented progress JN had made over the more than 3 months he spent at the BHU, that JN deserved a chance to alleviate the documented depression he was suffering as the result of that long stay

9

by being released to a setting where he could assume more control over his life.

" . . . [This was a] considered professional opinion. . . . The Scripps BHU took very good care of JN for 100 days. He gained weight. He gained insight. He learned to ask for the pill that helped him cope. Without Dr. Chauhan's sensitive intercession, there would never have been a conservatorship in the first place. No one else was making the nuanced determination that once JN was stabilized on anti-psychotic medications, he was actually being <u>harmed</u> by a long hospital stay."

Regarding the allegations of elder abuse, the court said:

"Even assuming the [OPC's] disagreement [with Dr. Chauhan's professional opinion] was valid, the court is hard pressed to imagine a setting in which a professional disagreement about the wisest course for a schizophrenic patient would amount to elder abuse. And it bears repeating that had the anti-psychotic drugs been delivered to the ILF as Dr. Chauhan ordered, JN may very well have been able to remain medication compliant . . . and otherwise settle into a routine at the ILF . . . .

"Dr. Chauhan . . . sought the conservatorship which ultimately led to JN getting what he needed. Dr. Chauhan and the Scripps Health treatment team took good care of JN for more than three months, during which time he improved by several measures despite the inescapable fact that he was a very complicated and difficult patient. . . . The court is left with the abiding conclusion that elder abuse is the exact *opposite* of what Scripps Health did for JN." (Italics added.)

Regarding the allegations that Scripps had violated the conservatorship order, the court said:

"The evidence preponderates in favor of a finding that Scripps Health reasonably believed that the public conservator ultimately conceded to the discharge plan. First, . . . the public conservator did not approach Judge Maguire [the judge who had signed the conservatorship order]. This alone is evidence of consent . . . Mark Sellers,

10

the public conservator, had . . . the obligation . . . to approach Judge Maguire if he felt the discharge decision violated the conservatorship order or was not in the best interests of the conservatee (JN). He did not do so, and from all that appears neither Ms. Litwak nor Ms. Koller urged him to do so.

"Second, according to her testimony and Ex. 3, Ms. Litwak . . . was informed of the treatment team's intention 'to discharge [JN] to an ILF.' Ms. Litwak then stated she (not Sellers) was 'totally against it,' and asked for a call from Dr. Chauhan. He called her later that same day, and she was told '[JN] has been at the hospital for 96 days and has improved significantly.' Both Litwak and Chauhan had 'concerns.' Litwak then reported the exchange with Chauhan (and the statement of intention to discharge) to her supervisor (Koller). Koller spoke to Gholson the very next day, Dec. 13 (which was a Friday). While Koller expressed her 'concerns,' her note within Ex. 3 does <u>not</u> say 'I told Gholson not to discharge him.' It doesn't even parrot the language used by Litwak the day before ('totally against it'). According to Ms. Gholson's testimony, which the court credited, Koller did not say she opposed the discharge after hearing Gholson's explanations of the reasons underlying it. And, critically, it is very noteworthy that the People did not call Koller to come in and testify about this crucial exchange. Nor was there evidence of Sellers taking any steps to prevent the discharge. Under all of the circumstances, and particularly when it was clear that Koller was Litwak's supervisor, it was reasonable for Scripps Health to conclude that after being presented with the facts which gave rise to the discharge decision the public conservator's office had (perhaps reluctantly) consented to the discharge. This, in the court's view, takes this case well outside the realm of a willful violation of a court order.

"Further . . . [t]he evidence easily preponderated in favor of a finding that, despite numerous efforts over more than 3 months, Scripps Health could not find a closed (locked) treatment facility that would accept JN. In other words, it was not possible for Scripps Health to . . . discharg[e] JN to

11

a closed (locked) treatment facility once the need for him to receive care at an acute care hospital was over. And the court is unwilling to accept the proposition that [the conservatorship] order can reasonably be interpreted to require that JN stay at the Scripps BHU forever (because this interpretation would convert the Scripps BHU into something like a state mental hospital, which the order plainly did not contemplate without a further showing to Judge Maguire)."

As to credibility, the statement of decision touched on the testimony of four witnesses aligned with Scripps, and two aligned with the People. Insofar as the Scripps-aligned witnesses are concerned, the credibility findings were uniformly favorable. Thus, for example, the court said that Dr. Chauhan was "very credible and unrehearsed" and that he "[c]redibly denie[d] financial pressure to discharge" J.N. It described Gholson as "[v]ery credible and solid." It perceived Scripps's director of patient care as a "[v]ery friendly, knowledgeable and open witness." And it characterized Dr. Plopper as a "[v]ery calm and solid witness" whose "opinions were not seriously undercut on cross."

By contrast, the credibility findings for witnesses aligned with the People were uniformly negative. Thus, for example, the court said that certain aspects of Litwak's testimony were contradicted by notes from J.N.'s medical records, and that "[t]he cross was effective and exposed shortcomings by the public conservator[ ]'s office." And it characterized aspects of Johnson's testimony as "[e]vasive," and said that Johnson "was significantly undercut on cross and not really rehabilitated on redirect."

Following entry of its statement of decision, the court entered judgment in favor of Scripps and against the People. The People timely appealed.

12

## II.

## DISCUSSION

The People raise two discrete issues on appeal. Specifically, they contend (1) that the evidence was insufficient to sustain a finding that the OPC had consented to J.N. being discharged to an ILF; and (2) that the court abused its discretion in denying their motion for leave to designate an expert witness after the deadline to do so had passed.

### A.    Finding Regarding OPC Consent

In addressing the People's contention that substantial evidence did not support a finding that the OPC had consented to J.N. being discharged to an ILF, we begin with the observation that this contention misstates the pertinent finding. The trial court did not find that the OPC had consented to J.N. being discharged to an ILF. Rather, it found that *it was reasonable for Scripps to believe* that the OPC had consented.

Whether the court erred in making this finding turns on an application of the substantial evidence standard of review. (*Deck v. Developers Investment Co., Inc.* (2023) 89 Cal.App.5th 808, 824 [a " 'trial court's factual findings are reviewed under the substantial evidence standard' "].)

"This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. . . . Under this standard of review, parties challenging a trial court's factfinding bear an ' "enormous burden." ' " (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).)

"If substantial evidence supports factual findings, those findings must not be disturbed on appeal. [Citation.] Inferences favorable to appellants may create conflicts in the evidence, but that is of no consequence. [Citation.]

13

When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings. [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Schmidt, supra*, 44 Cal.App.5th at p. 582.)

Consequently, "[t]he testimony of a single credible witness—even if a party to the action—may constitute 'substantial evidence.' " (Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2024) ¶ 8:52, p. 8-26; accord *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [" 'The testimony of a witness, even the party himself, may be sufficient.' "].) " '[W]hen there is substantial evidence in support of the trial court's decision, the reviewing court has *no power to substitute its deductions*.' " (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429, fn. 5.)

Additionally, it is the role of *the trial court*—not the Court of Appeal— to make credibility determinations (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177); and (other than perhaps in extraordinary circumstances) those determinations are *conclusive* on appeal.  (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 [" '[w]e . . . are bound by the trial court's credibility determinations' "]; *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162 [" '[i]t is not our role as a reviewing court to . . . assess witness credibility' "].)

Bearing these principles in mind, it is not difficult for us to conclude that substantial evidence supported the trial court's finding that it was reasonable for Scripps to believe the OPC had consented to J.N. being discharged to an ILF.  Dr. Chauhan testified that the OPC representative

with whom he had spoken (Litwak) expressly consented. Gholson testified that the OPC representative with whom *she* had spoken (Koller) did not express opposition and did not request a case conference. Dr. Popper testified in essence that, even if Koller *had* requested a case conference, that would not necessarily have indicated disagreement. And the court found in favor of the credibility of each of these three witnesses. These circumstances alone warrant a conclusion that substantial evidence supported the court's finding that it was reasonable for Scripps to believe the OPC had consented.

Moreover, the evidence to the contrary was wanting. Specifically, the one witness (Litwak) on whose testimony the People rely in support of their contention to the contrary was found to be partially lacking in credibility. And the position of the People was further undercut by the absence of any evidence to indicate that the OPC sought court intervention to prohibit the discharge and by Koller's absence at trial.

Based on these observations, we conclude the court did not err in finding it was reasonable for Scripps to believe the OPC had consented to J.N. being discharged to the New Horizons ILF.

## B.     Expert Witness Designation

The People's second contention on appeal is that the trial court erred in denying their motion for leave to designate an expert witness after the deadline to do so had passed.

### 1.     Statutory Framework Governing Leave to Submit Tardy Expert Witness Information

The People's motion for leave to designate an expert witness after the deadline to do so had passed[7] was in essence a motion for leave to submit

---

7     The People titled this motion a "Motion to Re-Set Date for Exchange of Expert Information (CCP §§ 2034.710, 2034.720)."

15

tardy expert witness information within the meaning of section 2034.710 of the Code of Civil Procedure.[8]  Section 2034.710 vests trial courts with discretion to relieve litigants from the consequences of having failed to timely designate an expert witness.  (See § 2034.710, subd. (a) ["the court *may* grant leave to submit that information on a later date," italics added].)  However, the discretion conferred under section 2034.710 is circumscribed by a neighboring section of the code—section 2034.720—which provides that "[t]he court shall grant leave to submit tardy expert witness information *only* if *all* of the following conditions are satisfied."  (§ 2034.720, italics added; see also *Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 421 (*Cottini*) ["[c]onversely, the trial *shall not* grant leave to submit late expert witness information [under § 2034.710] if *any* of the statutory conditions [set forth in § 2034.720] are *not* satisfied," third italics added].)

Among the statutory conditions that must be satisfied under section 2034.720 in order for the court to be able to grant leave to submit tardy expert witness information under section 2034.710 is a determination "that the moving party did *all* of the following:  [¶]  (1) Failed to submit the information as the result of mistake, inadvertence, surprise, or excusable neglect.  [¶]  (2) Sought leave to submit the information promptly after learning of the mistake, inadvertence, surprise, or excusable neglect.  [¶] (3) Promptly thereafter served a copy of the proposed expert witness information . . . on all other parties who have appeared in the action." (§ 2034.720, subd. (c), italics added.)  It follows then that, if any one of the three elements enumerated above was not satisfied, then the trial court was *precluded* from granting the People's motion for leave to designate an expert witness after the deadline to do so had passed.

---

8    All unspecified statutory references are to the Code of Civil Procedure.

16

## 2. Additional Background

### a. Pertinent Pretrial Proceedings

In assessing whether the People failed to meet any of the three requisite elements, we are aided by a review of certain events that comprised the pretrial phase of this case. The first such event was the People's filing of their original complaint on August 27, 2021. This pleading included an allegation of elder abuse, *which the People concede required an expert witness* to prove. Likewise, the amended complaint on which the People ultimately proceeded to trial also included an allegation of elder abuse.

Thereafter, during an August 19, 2022 hearing in which the court changed the trial date and deadlines that had previously been set for the first and second exchanges of expert witness information, Scripps's counsel stated in the presence of the People's counsel that Scripps anticipated designating an expert witness on the standard of care for discharging a patient. The new deadlines the court set for exchanging expert witness information were February 10, 2023, and February 24, 2023.

On the February 10 deadline for the first exchange of expert witness information, Scripps designated Dr. Plopper as its expert witness and served the People with the expert witness disclosure information it was required to serve pursuant to section 2034.260. But, when February 11 arrived, the People had not designated an expert witness of their own.

Three weeks later, on March 17, 2023, the court heard—and then granted in part and denied in part—a motion by Scripps for a protective order that, in Scripps's words, was intended to resolve "whether, and if so to what extent, the [People were] permitted to obtain . . . J.N.'s confidential medical information from Scripps." This hearing was attended by two attorneys for the People and by two attorneys for Scripps. Not long after this

17

hearing had commenced, the following colloquy occurred between the court and one of the Scripps attorneys:

> "Court:  I'm going to give you new expert designation dates today, aren't I?
>
> "[Counsel]:  No.  Designation [dates] have come and gone.
>
> "Court:  Okay.  So you've designated an expert.
>
> "[Counsel]:  We have.
>
> "Court:  More than one?
>
> "[Counsel]:  Just one.
>
> "Court:  How about the People?
>
> "[Counsel]:  The People did not designate experts."

The court then moved on to address the discovery motion and, following that, the trial date—which it reset to a date in September of 2023.  Then, reverting back to the topic of expert witnesses, the court said:  "I'm informed that expert witnesses have already been exchanged, and I'll forbear giving you dates."  At no time during this hearing did either of the attorneys representing the People respond to any of the remarks bearing on the topic of expert witnesses; nor did they otherwise address themselves to that topic.  In the words of the court (several weeks later), it was "crickets."

One week later, on March 24, the People filed an opposition to a motion for summary judgment that Scripps had filed some time earlier.  In this opposition, the People asked the court to deny the motion for summary judgment or, in the alternative, to grant a continuance.  They did not, in this motion, ask the court to relieve them from the consequences of having failed to timely designate an expert witness.

Thereafter, on April 12—nearly four weeks after the March 17 hearing, nearly nine weeks after the deadline to designate an expert witness, and nearly 20 months after the filing of the original complaint—the People

18

reached out to Scripps to propose that it stipulate to permit them to designate an expert witness. Scripps refused to stipulate. One week later (on April 19), the parties completed a meet and confer. And one week after that (on April 26), the People filed their motion pursuant to section 2034.710.

Of the four grounds for relief articulated in section 2034.710 (mistake, inadvertence, surprise, and excusable neglect), the People asserted just one—mistake—as the basis for their motion. In the words of the brief they submitted to the trial court:

> "[T]he People meet all the requirements of [section 2034.710, subdivision] c. The People failed to submit timely expert designations as a result of a mistaken understanding of the court-set deadline for expert designations. The People intended to ask for a continuance of the trial date as part of its opposition to the motion for summary judgment under Code of Civil Procedure section 437c, and mistakenly believed that the Court, in granting such a continuance, would also move any deadline for expert designation. [Citation to attorney declaration.] The People believed this would be warranted because the reason for the section 437c continuance was Scripps' refusal to provide any relevant discovery, including its refusal to produce a person most knowledgeable to testify on any topics designated by the People. [Citation to attorney declaration.] Such a lack of discovery would have made it impossible for the People to adequately disclose experts to testify in a timely fashion regarding the facts in this case.

> "In fact, the trial date was moved due to the parties stipulating to move [the deadline to file an] opposition to the motion for summary judgment [one week] due to a medical issue on the part of [one of] the People's counsel.[ ] The People acknowledge that they did not immediately consider, at the time of the discussions about extending the motion for summary judgment briefing and subsequent order rescheduling the trial, the implications for the expert designation deadline. Scripps raised this deadline— without prior notice or meeting and conferring with the People—for the first time at the hearing on the motion for

19

the protective order on March 17, 2023, which is when the People recognized their error. [Citation to attorney declaration.] The People then moved promptly to satisfy the conditions for this motion, including reaching out to opposing counsel and scheduling the earliest date possible for this motion to be heard."[9]

The trial court was unmoved by the People's motion and, at the conclusion of a spirited hearing, denied it. Addressing itself to the ground on which the motion had been made—mistake—the court cited *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1206 for the proposition that: " '[m]istake is not a ground for relief under section 473, subdivision (b), when "the court finds that the 'mistake' is simply the result of professional incompetence, general ignorance of the law, or unjustifiable negligence in discovering the law[.]" ' " And then it concluded: "[T]his is precisely what we have here."

Addressing itself to the topic of promptness, the court said:

"[T]he People did not act promptly after learning of the failure to timely designate experts. The People were served with Scripps' designation in February 2023, but did nothing.

"Making matters worse, at the March 17, 2023 hearing, the court inquired as to whether the parties needed new expert designation dates. . . . Counsel for Scripps answered in the negative. . . . The People, who were represented at the hearing, did not respond to the court's question or otherwise dispute counsel's statement. Nor did the People attempt to correct the court when it declined to give new dates because 'expert witnesses have already been exchanged[.]' . . . The People did nothing until April 14, when [they] finally called to place this motion on calendar."

---

9 The sole evidence submitted in support of the People's motion was a one-page declaration in which one of their attorneys paraphrased several of the statements quoted above from the People's brief and in which she authenticated the declaration's only exhibit (a copy of the minute order from the March 17 hearing).

In addition, the court went beyond the ground (i.e., mistake) that the People had proffered as the basis for their motion and addressed itself to the three grounds *other than* mistake that section 2034.720, subdivision (c)(1), recognizes as valid bases on which the court may exercise its discretion to grant relief pursuant to section 2034.710. Focusing on surprise, the court said:

> "The term 'surprise' refers to ' "some condition or situation in which a party . . . is unexpectedly placed to his injury, without any default or negligence of his own, which ordinary prudence could not have guarded against." ' *Credit Managers Assn. v. National Independent Business Alliance* (1984) 162 Cal.App.3d 1166, 1173. There is no legally cognizable 'surprise' in this case: [C]ounsel for the People was present in open court when the expert designation deadlines were set. The court may presume that counsel returned to the office after the August 19, 2022 hearing and calendared the litigation benchmarks that were set by the court; there is no evidence to the contrary. The People suggest no misleading conduct by counsel for Scripps; indeed, counsel for Scripps was forthcoming at the March 17, 2023 hearing, and counsel for the People remained conspicuously silent."

Focusing on the other two permissible grounds for being afforded relief under section 2034.710—inadvertence and excusable neglect—the court said:

> "Finally, as for inadvertence or neglect, '[t]o warrant relief under section 473 a litigant's neglect must have been such as might have been the act of a reasonably prudent person under the same circumstances. The inadvertence contemplated by the statute does not mean mere inadvertence in the abstract. If it is wholly inexcusable it does not justify relief.' *Elms v. Elms* (1946) 72 Cal.App.2d 508, 513. In this case, for the reasons discussed above, the People's conduct in connection with both the August 19 and March 17 hearings was not commensurate with that of a reasonably prudent person. As the *Elms* court made clear, a party may not simply change its mind and then claim entitlement to have the results of its carelessness swept

21

aside. There is more than a little evidence to raise the inference that the People made a deliberate decision not to designate an expert, and have now thought better of it. This does not justify the relief sought, and indeed would yield an advantage to the People that the Code of Civil Procedure does not contemplate: CCP section 2034.210 requires a 'mutual and simultaneous exchange' of experts."

Summarizing its ruling, the court said: "The People have failed to make a sufficient showing of mistake, inadvertence, surprise, or excusable neglect. Code Civ. Proc. § 2034.720[, subdivision] (c)(1). To the contrary, the evidence before the court shows *in*excusable neglect."

### b. (Shifting) Arguments on Appeal

On appeal, the People have argued four new bases for the position they espouse. In this regard, they continue to argue that "they made a mistake by assuming the court would re-set expert witness exchange dates after continuing the trial date in light of Scripps's discovery delays and motion for summary judgment" and that "[t]his mistake reflected a misunderstanding of . . . section 437c[, subdivision] (h)," But they supplement this argument with four additional arguments that were not presented to the trial court. These are: (1) that they also made a "mistake" by "fail[ing] to ask the court to re-set the expert exchange dates . . . [before] the deadlines passed"; (2) that they "made a mistake at the discovery hearing on March 17, 2023, by not clarifying that [they] intended to designate an expert"; (3) that they "made [yet another] mistake by not requesting new expert exchange dates at [that] hearing"; and, in addition, (4) that "the circumstances surrounding [that] hearing demonstrate"—not only all these "mistake[s]"—but also "excusable neglect."

### 3. Standard of Review

We review the court's denial of the People's motion for an abuse of discretion. (*Cottini, supra*, 226 Cal.App.4th at pp. 418–419.) "A court abuses

22

its discretion only when" the decision it makes is " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.) As a consequence, " ' " [w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court' " ' " (*ibid.*) and "should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." ' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) As can be seen, the abuse-of-discretion standard that we apply to our review of the trial court's denial of the People's motion in this case is much like the substantial-evidence standard that we apply when a trial court's factual determinations are at issue. (See *Caden C.*, at p. 641 ["where . . . 'the appellate court will be evaluating the factual basis for an exercise of discretion, there likely will be no practical difference in application' " between the abuse-of-discretion and substantial-evidence standards of review (italics omitted)].)

### 4. Analysis

Applying the authorities discussed above, we therefore consider whether the record before the trial court was so utterly lacking in support as to render the court's denial of the People's motion "arbitrary, capricious, or patently absurd." We cannot say that the trial court's ruling was any of these things.

With regard to the finding that the failure to timely designate an expert witness was not attributable to mistake, inadvertence, surprise, or excusable neglect, the People have conceded that the allegations of elder abuse—on which they have predicated this action since day one—could not have been proven without an expert witness. Thus when they filed the complaint in August 2021, they ought to have been aware that one of the principal theories on which their action was predicated would require them to

23

engage and designate an expert witness. Their counsel appeared for the hearing at which the February 10, 2023, expert designation deadline was set. And, as the trial court noted, the explanations they furnished for having failed to comply with the deadline were unwarranted, inadequately supported, and illogical.

The People's explanations were (and are) unwarranted in that, true though it may be that trial courts often continue expert witness designation deadlines when they continue trial dates, it is almost never prudent—and almost always unreasonable for an attorney—to simply *assume* that that is what a trial court will do in any given circumstance. Here, if the People were finding themselves stymied by what they perceived as a "refusal [on the part of Scripps] to provide any relevant discovery," then it would have been incumbent upon them to file a motion to compel discovery compliance, a motion to continue the deadlines for exchanging expert witness information, or some other type of motion or application to invoke assistance from the trial court. Simply stated, the existence of a discovery dispute that remained to be resolved—even one that would bear on the production of documents that an expert witness would ultimately be called upon to review—does not justify a party either in failing to designate an expert witness before the deadline to do so expires or in failing to seek relief from the court before the deadline expires.

Moreover, the People's explanations are inadequately supported and illogical in that they leave key questions unresolved. Such questions include: Why did the people not recognize their lapse on February 10 when Scripps designated *its* expert and served the People with its expert witness information? If indeed the People had *intended* to ask for a continuance of the trial date as part of their opposition to the motion for summary judgment,

24

then why did they *not* ask for a continuance of the trial date as part of that opposition?  And, even if they *had* asked for a continuance of the trial date as part of that opposition, then what difference would this have made in light of the fact that the deadline to designate an expert witness had already elapsed six weeks earlier?  In addition:  Why did the People assume that the court would reset expert exchange dates after continuing the trial date, when—at the (March 17) hearing during which it *did* continue the trial date—it made clear  that, in its mind's eye, the exchange of expert witnesses was water under the bridge?  And why did the People not speak up at that time if they indeed disagreed?[10]

No meaningful insights into the answers to any of these key questions appear in the record before us.[11]

As for the matter of promptness following the March 17, 2023, hearing at which the People claim to have discovered their "mistake," the court was justified in concluding that the four weeks they waited beyond this date, before seeking relief, was too long.  The People furnished no explanation and no evidence to justify this passage of time.  (Nor for that matter did they

---

[10]  The People insinuate that they were caught by surprise and in essence ambushed when Scripps "raised [the matter of the lapsed expert witness designation] deadline—without prior notice or meeting and conferring with the People—for the first time at the hearing on the motion for the protective order on March 17, 2023."  But as revealed above, Scripps's counsel was merely answering questions being posed by the court as part of its routine case management function.  And the responsibility for initiating a meet and confer with respect to their motion was the People's, not Scripps's.

[11]  On appeal, the People attribute their neglect in part to a brain injury suffered by outside counsel.  But this assertion finds no support in the motion papers filed with the trial court or the evidentiary records that were provided to the trial court in support of the motion.

furnish any explanation or evidence to shed light on why their receipt of Scripps's expert witness designation on February 10—two months and two weeks before they finally got around to filing their motion—did not set off alarm bells on February 10.)

On a showing as thin as this, the trial court was well within the bounds of its discretion in concluding that the People had not met their burden.

## III.
## DISPOSITION

The judgment is affirmed. Scripps is entitled to costs on appeal.


KELETY, J.

I CONCUR:


BUCHANAN, J.

I CONCUR IN THE RESULT:


O'ROURKE, Acting P. J.

26